598 A.2d 794

**Mari–Ane FOWLER, et al.**

v.

**PRINTERS II, INC.**

**No. 64, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

Dec. 3, 1991.

---

**450**

452

David P. Blackwood (J. Gordon Forester, Jr. and Greenstein, Delorme & Luchs, P.C., on the brief) Washington, D.C., for appellants.

Wayne G. Travell and David A. Rosenberg (Tucker, Flyer & Lewis, P.C., on the brief) Washington, D.C., for appellee.

Argued before BISHOP, WENNER and MOTZ, JJ.

MOTZ, Judge.

This case arises out of a nonsolicitation clause in an employment contract. Appellee/cross appellant, Printers II, Inc. ("Printers"), brought this action in the Circuit Court for Montgomery County (Weinstein, J.) against its former employee, Mari–Ane Fowler ("Fowler") and her new employer, Holladay–Tyler Printing Corporation ("Holladay–Tyler"). After a bench trial, the circuit court (Weinstein, J.) found that: (1) Fowler breached her employment contract with Printers and (2) Holladay–Tyler tortiously interfered with that employment contract. The lower court entered judgment for Printers against both Fowler and Holladay–Tyler in the aggregate amount of $410,976.00.

On appeal, appellants/cross appellees, Fowler and Holladay–Tyler, raise the following issues:[1]

1. Certain restrictive covenants in the employment contract are unenforceable as a matter of law.
2. The trial court erred in finding that Holladay–Tyler tortiously interfered with the employment contract.
3. The trial court erred in its calculation of damages.

In its appeal and cross-appeal, Printers asserts:

4. The trial court improperly limited Printers' damages.
5. The trial court erred in failing to award damages for Fowler's solicitation of a Printers' employee.
6. The trial court erred when, without a hearing or any findings of fact, it refused to impose sanctions on Fowler.

We affirm in most material respects, reverse one element of the damage award, and remand for further findings of fact on one ancillary issue and on the sanctions.

## FACTS AND PROCEEDINGS BELOW

On September 19, 1988, after having her lawyer examine it, Fowler executed a written employment contract with Printers, a commercial printer doing business in the Washington metropolitan area with yearly sales in excess of $20 million. Printers determined that it wanted to have its important sales personnel under employment contracts in order to protect Printers' client base.

When she signed the contract, Fowler was given a $15,-000 raise, so that her annual salary totaled approximately $110,000. As one of Printers' top salespeople, Fowler achieved approximately $4 million in aggregate sales in fiscal year 1988. For more than seven months after signing the contract, Fowler accepted the higher salary and continued as an employee of Printers. At no time during her employment did she complain to Printers about the employ-

---

1. For the sake of clarity, we have reorganized, combined, and shortened some of these issues.

ment contract, or in any way indicate to Printers that she felt the employment contract was invalid.

In the employment contract, Fowler agreed that during the period of her employment by Printers *and* for one year after termination of employment, she would not disclose information concerning Printers' business, divert or solicit any business from Printers, service or take orders from any accounts or customers of Printers or hire any employee of Printers. The scope of the accounts/customer restriction was limited to those accounts and customers that had contact with Printers within the twelve months immediately preceding the termination date.

On May 1, 1989, Fowler submitted her written resignation to Printers. Her letter expressed "deep regret" at leaving Printers. At a meeting with Printers' Vice President, in which Fowler gave him this letter of resignation, she assured him that she would not solicit or service clients of Printers and acknowledged her obligations under the contract of employment.

It appears that within hours of terminating her employment relationship with Printers, Fowler became employed by Holladay–Tyler, one of Printers' competitors in the printing business, at a pay cut of approximately $20,000.00. On May 2, 1989, the day after her resignation from Printers and her first full day as a salesperson at Holladay–Tyler, Fowler began contacting the accounts/customers which she had serviced at Printers.

Printers became aware of these solicitations and on May 8, 1989, advised Fowler in writing that such solicitations constituted a violation of her employment contract. Printers further demanded that she cease this activity. On May 9, 1989, Printers notified, in writing, the President of Holladay–Tyler, Howard Sullivan, that Printers intended to enforce Fowler's contract and hold Fowler and Holladay–Tyler liable for any violations of it. Indeed, Printers sent Sullivan a copy of the contract with specific reference made to the restrictive covenants contained in the contract. Neverthe-

less, Fowler continued to solicit business from her former clients with the knowledge and encouragement of her new employer, Holladay–Tyler.

In September 1989, Printers learned of these continued solicitations. Unable to obtain voluntary compliance with the contract terms by Fowler or Holladay–Tyler, Printers filed a two-count complaint on September 29, 1989. Printers alleged that: (1) Fowler breached her contract to Printers and (2) Holladay–Tyler intentionally interfered with that contract; Printers sought to be compensated in money damages for these wrongs. In addition, Printers sought an *ex parte* injunction against both appellants. On October 12, 1989, the circuit court granted the *ex parte* injunction, observing that it appeared that Fowler "actively solicited or attempted to solicit business from customers of Printers and that Holladay–Tyler may have intentionally participated with Ms. Fowler in breaching the terms of her employment contract."

On November 2, 1989, the circuit court issued an interlocutory injunction ordering, *inter alia*, that Fowler "be restrained and enjoined from attempting to solicit any business from each and every customer of Printers II, Inc. which she had serviced as an employee of Printers II, Inc. during the period of her employment." By the same order, the court restrained and enjoined Fowler from contacting any employee of Printers "to persuade the employees to apply for employment at Holladay–Tyler." Finally, the order restrained and enjoined Fowler from "disclosing to any person or entity any confidential proprietary information of Printers II, Inc. which she obtained during her employment." The interlocutory injunction, by its terms, expired on May 1, 1990, and there was no further claim for equitable relief. The grant of the interlocutory injunction was not appealed.

A nine-day bench trial was held from October 22, 1990 to November 1, 1990. At trial, Printers presented voluminous documentary and testimonial evidence to demonstrate that Fowler repeatedly and intentionally violated the contract

and the interlocutory injunction and that Holladay–Tyler knew of, participated in, and benefitted from her actions.

On December 3, 1990, Judge Weinstein issued a well reasoned written Opinion and Order. After first carefully reviewing the above facts,[2] he found:

[t]he record is replete with evidence that Ms. Fowler actively solicited business from these accounts [eight accounts which she had serviced while at Printers] by either direct submission of bids or by personal contact with the various account representatives. Reimbursable expense accounts and telephone records relating to entertainment of these clients by Ms. Fowler to Holladay–Tyler attested to the company's actual knowledge of her activities.

He further found that "Printers II had a protectable business interest in preventing Ms. Fowler from using the contacts she had established while at Printers II to pirate its customers. It is evident that the printing business community is close knit and highly competitive." The court concluded that the restrictive covenants in the employment contract "were merely efforts to guard against the unprincipled and predatory tactics of competitors" and met the "test of reasonableness" based on the facts of this case. Accordingly, the court awarded Printers $360,976.00 in damages for breach of the employment contract by Fowler and tortious interference with it by Holladay–Tyler and $50,-000.00 for damage to Printers' reputation and good will.

Printers then moved for sanctions and civil contempt and requested a hearing on its motion. On January 8, 1991, without holding a hearing, the lower court issued a short order denying Printers' motion. The parties noted timely appeals and cross appeals from both orders. Additional facts will be set forth within as necessary.

_____

**2.** The account of the facts set forth above is largely based on the circuit court's written opinion.

## LEGAL ANALYSIS

I. *The Enforceability of the Restrictive Covenants in the Employment Contract*

Fowler and Holladay–Tyler claim that the restrictive covenants in Fowler's employment contract with Printers are unenforceable because they "serve no legitimate interest" of Printers and because they are "overly broad."

In support of their initial argument on this point, appellants rely upon *Budget Rent A Car of Washington, Inc. v. Raab*, 268 Md. 478, 303 A.2d 11 (1973) and *Becker v. Bailey*, 268 Md. 93, 299 A.2d 835 (1973). Neither case aids their cause. It is true that in both the court refused to enforce restrictive covenants; however, in both, the employee was an unskilled worker, without unique skills, who did not solicit the customers of his former employer. Both cases, therefore, followed what the *Becker* court characterized as the "general rule" that an employer has a legitimate interest and so can enforce "restrictive covenants" only against those "employees who provide unique services, *or to prevent* the future misuse of trade secrets, routes, or lists of clients, or *solicitation of customers*." 268 Md. at 97, 299 A.2d 835 (emphasis added). Other cases elaborate that an employer has a protectable interest and that

> *restraint is justified* if a part of the compensated services of the former employee consisted in the creation of the good will of customers and clients which is likely to follow the person of the former employee ... *restraint is not justified* if the harm caused by service to another consists merely in the fact that the former employee becomes a more efficient competitor....

*Silver v. Goldberger*, 231 Md. 1, 7, 188 A.2d 155 (1963) (footnote omitted) (emphasis in original). *Accord, Holloway v. Faw, Casson & Co.*, 319 Md. 324, 335, 572 A.2d 510 (1990).

Here, there was ample evidence that part of Fowler's services consisted in the "creation of good will" of clients who were "likely to," and did, "follow her" when she left

Printers and that Fowler vigorously, repeatedly, and successfully "solicited" Printers' customers. Thus, application of the rule relied upon in *Budget* and *Becker,* and refined in later cases, leads us to affirm the circuit court's finding that Printers did indeed have a "legitimate interest" that was protected by the restrictive covenant. Of course, even a restrictive covenant that serves an employer's "legitimate interest" can be no broader, or more restrictive, than necessary to effectuate that interest.

Accordingly, we turn to appellants' principal objection to the restrictive covenant, its alleged overbreadth. The specific portion of the employment contract to which appellants object is the following:

> Employee [Fowler] hereby covenants and agrees that [s]he shall not ... directly or indirectly, divert business from Employer [Printers] or solicit (or attempt to solicit) any business from, or service or take orders from (or attempt to service or take orders from), any account of Employer. For purposes of this paragraph 9, the terms "account" and "customer" shall mean, with respect to any particular date, any corporation, joint venture, partnership, individual or other entity to or for which Employer shall have sold any of its products or performed any of its services or have been paid with respect to any of its products or services, within the previous twelve (12) months, or to or for which Employer shall be in the process of producing any of its products or performing any of its services *or to or for which Employer shall have submitted a bid, or be in the process of submitting a bid, to produce any of its products or to perform any of its services;* provided, however, that for the twelve (12) month period following the termination of employment of Employee, the determination which persons or entities are "accounts" and "customers" shall be made (in accordance with the foregoing provisions of this sentence) as of the date of such termination of employment.

(emphasis added). Pointing to this language, particularly to the portion that is underscored, the appellants assert that

the covenant was too broad because Fowler was prohibited "not only from contacting customers with whom she had dealt personally, but any customers or potential customers of Printers II regardless of whether Printers II had ever successfully secured business from that entity."

All parties heavily rely on *Holloway v. Faw, Casson & Co.*, 319 Md. 324, 572 A.2d 510 (1990). There, the Court of Appeals, in upholding a noncompetition clause in an employment contract, noted that the "enforceability of a covenant not to compete depends on the facts of a given case." 319 Md. at 334, 572 A.2d 510. In *Holloway*, the challenged covenants provided, *inter alia*, that for five years after a partner left his accounting firm ("F.C.") he would not engage in an accounting practice within a forty-five mile radius of any office of F.C. If he did so, he agreed to pay F.C., in the event any F.C. client engaged him in his new accounting practice, an amount equal to F.C.'s billings to that client for the 12 months immediately preceding the new engagement. *Id.* at 326–27, 572 A.2d 510. When a partner left and immediately joined an accounting practice within five miles of the F.C. office, taking 171 F.C. clients with him, F.C. filed suit seeking damages from its former partner. *Id.* at 327, 572 A.2d 510. F.C. did not request any injunctive relief. *Id.* at 328, 572 A.2d 510. The partner counterclaimed for damages and a declaration that the covenant described above was invalid. *Id.*

On summary judgment, the trial court declared, *inter alia*, that the covenant as written was unreasonable because: (1) it "could include clients who might first become F.C. clients after [the partner] left"; and (2) five years was an unreasonable duration. *Id.* at 329, 572 A.2d 510. The trial court, however, determined that it could interpret and modify the contract so that it only prohibited a partner from servicing, for *three* years, F.C. clients who were serviced by F.C. *at the time the partner left* and declared that the contract, as modified, was reasonable. *Id.* at 330, 572 A.2d 510. A jury then awarded F.C. the damages provided in the contract, *i.e.*, the prior year's fees for all 171 clients who

had been serviced by F.C. at the time the partner left and who followed the partner. *Id.* at 331, 572 A.2d 510. A divided panel of this court affirmed the circuit court "in all material respects," *id.* at 331, 572 A.2d 510, concluding that the covenant could be modified even though the modification went beyond the traditional Maryland "blue pencil" rule, *i.e.*, "crossing out a few words with a blue pencil." *Holloway v. Faw Casson & Co.*, 78 Md.App. 205, 230–39, 552 A.2d 1311, *aff'd in part, rev'd in part*, 319 Md. 324, 572 A.2d 510 (1990). In dissent, former Chief Judge Gilbert was "unable to accept the proposition that courts should rewrite contracts in order to save the parties from themselves." 78 Md.App. at 251, 552 A.2d 1311. The Court of Appeals, *inter alia*, affirmed the award of damages, and concluded that it need not reach the "provocative questions concerning judicial power" raised by the lower courts' holding as to the declaratory relief because it found the covenant "severable on a client by client basis." 319 Md. at 353, 572 A.2d 510.

We have outlined the relevant facts, procedural history, and holdings in *Holloway* in some detail because understanding them is pivotal to understanding the parties' arguments in the case at hand. The parties devote a great deal of time and energy to arguing whether the covenant here is severable, as the *Holloway* covenant was. Although Printers does assert briefly that the covenant is not too broad, it devotes most of its attention to attempting to demonstrate that any invalidity is "severable" on a "client by client" basis; it does not urge that the contract be rewritten, except for a possible "blue pencil" change. Appellants, on the other hand, claim that the damages awarded by the circuit court cannot stand because the covenant is too broad and, unlike the covenant in *Holloway*, is not "severable" on a "client by client basis" without rewriting it, which they assert is not permitted.

This emphasis by the parties here on the severability portion of the *Holloway* opinion, *see* 319 Md. at 351–354, 572 A.2d 510, is difficult to understand. Severability on a

"client by client" basis was discussed in *Holloway* only in determining the validity of the declaratory relief granted there; no issue of the validity of declaratory or injunctive relief is raised here.[3] All that Printers requested at trial, and all that the circuit court granted, was a money judgment. Thus, the *Holloway* discussion as to severability on a "client by client" basis is irrelevant here. 319 Md. at 353, 572 A.2d 510.

The Court of Appeals in *Holloway* did, however, also consider the question of whether the covenant was too broad to permit grant of the money judgment. That discussion clearly is relevant here. In considering the money judgment, the *Holloway* court noted that some courts in other jurisdictions had held similar noncompetition clauses "too broad because the term 'clients,' might include persons who no longer use the firm's services at the time the employee leaves ... or ... persons who first become clients after the employee leaves" or persons for whom the departing employee did not "actually render services." 319 Md. at 345, 572 A.2d 510. It then held

*[f]rom the standpoint of the money judgment* against Holloway, *the questions raised by these cases are not presented here.*

319 Md. at 345, 572 A.2d 510 (emphasis added). The *Holloway* court reached this conclusion because the employee in *Holloway* "acknowledged that each person as to whom a claim for damages was made" was a client of F.C. whom the employee himself "had served" when previously employed there. *Id.* Precisely the same reasoning is applicable here. That is, Fowler acknowledged that each client "as to whom a claim for damages was made"—eight specific

---

**3.** As noted within, at Printers' behest, the circuit court did issue *ex parte* injunctions against both appellants and a preliminary injunction against Fowler. The grant of the latter was not appealed and all injunctive relief expired on its own terms by May 1, 1990. There was no request at trial for injunctive or declaratory relief, and the circuit court granted none. Thus, no issue as to the propriety of any injunctive or declaratory relief is before us.

clients—was a client of Printers whom Fowler herself "served" when she worked at Printers. Accordingly, as in *Holloway*, because Printers sought, and the lower court awarded, only money damages relating to clients actually served by the employee, here Fowler, questions as to the breadth of the contract beyond this breach are "not presented here." [4]

Moreover, if these questions were before us, we believe that the covenant here would be enforceable for reasons not discussed in, or relevant to, the clause in *Holloway*. The covenant here, unlike that in *Holloway*, is not a noncompetition clause. It does not bar Fowler, at any time, from working for a competitor of Printers, even in the same geographic area as Printers, and even on behalf of a Printers' account or client. It simply prohibits Fowler, for one year, from soliciting business from Printers' "accounts and clients." Nonsolicitation clauses, in some respects more restrictive than that at issue here, have been upheld in Maryland.

In *Tuttle v. Riggs–Warfield–Roloson, Inc.*, 251 Md. 45, 47–49, 246 A.2d 588 (1968), a covenant prohibiting an insurance agent's representative, for two years after termination, from "engaging either directly or indirectly in any insurance activities with customers" of its former employer,

---

4. Contrary to appellants' assertions, *MacIntosh v. Brunswick*, 241 Md. 24, 215 A.2d 222 (1965), does not suggest to the contrary. In *MacIntosh*, a salesman who was "discharged through no fault of his own" sued his employer for bonuses due him. 241 Md. at 31, 215 A.2d 222. The court permitted him to recover those earned bonuses even though he had violated a contract that required forfeiture of bonuses if, at any time during the next five years, in any place, he engaged "directly or indirectly in any business activity substantially competitive" with the employer. 241 Md. at 29, 215 A.2d 222. The court held the contract unreasonable and not "necessary to protect the business interest of the former employer" because: (1) it was unilaterally imposed on the employee; (2) it was "unlimited" as to area; and (3) its duration imposed an unreasonable hardship on the employee. 241 Md. at 31, 215 A.2d 222. The contract contained no provision limiting the employee's contact to certain clients or accounts and so, of course, the court never discussed this. Thus, *MacIntosh* is inapposite on this issue.

was held valid and enforceable. In *Gill v. Computer Equip. Corp.*, 266 Md. 170, 180, 292 A.2d 54 (1972), the court upheld a covenant prohibiting the employee, for two years after termination, from working for, or servicing the products of, any manufacturer which had been "represented by" his former employer "during all or any part" of the year preceding termination.[5] The duration of both covenants was twice as long as the covenant at issue here, and in *Tuttle* the covenant prohibited the employee from "engaging ... in any insurance" activities with his former employer's clients and was held to be violated even without any proof of solicitation of clients. *See also Hebb v. Stump, Harvey & Cook, Inc.*, 25 Md.App. 478, 481, 334 A.2d 563, *cert. denied*, 275 Md. 749 (1975).

■ Thus, in both *Tuttle* and *Gill*, the Court of Appeals upheld nonsolicitation clauses that prohibited an employee from soliciting not just customers of his former employer, for whom the employee had worked, but rather *all customers of his former employer*. Accordingly, *Tuttle* and *Gill* would appear to dispose of appellants' claims that the covenant here is unreasonably broad because it bars Fowler from soliciting a Printers' customer or account, even though Fowler did not work on that account or for that customer. The covenant here, however, is in one respect broader than those considered in *Tuttle* and *Gill*. It prohibits Fowler from soliciting business from any entity for which Printers "shall have submitted a bid," or is in "the process of submitting a bid" in the previous twelve months. If this provision were determined to be unnecessarily broad, it could be eliminated simply by excising, by "blue pencil," that portion of the restrictive covenant which is underlined above. *See supra* at p. 459. Such "blue pencil" excision of offending contractual language without supplementation or rearrangement of any language is entirely in accord with

5. Both *Tuttle* and *Gill* are discussed with approval in *Holloway*, 319 Md. at 346, 572 A.2d 510. Accordingly, there is no reason to believe that they do not represent the current views of the Court of Appeals.

Maryland law. *See, e.g., MacIntosh v. Brunswick*, 241 Md. 24, 27–31, 215 A.2d 222 (1965); *Tawney v. Mutual System of Maryland*, 186 Md. 508, 521, 47 A.2d 372 (1946); *Hebb v. Stump, Harvey & Cook*, 25 Md.App. at 491, 334 A.2d 563. Appellants do not argue to the contrary. Indeed, they devote ten pages in their briefs to argument that the "blue pencil rule is, and should continue to be, the law in Maryland." Nor do they define that rule any differently than we do; rather, they describe the rule as follows: "the court takes its pen and draws a line through the offending restriction. If the covenant is still enforceable after the applicable language is removed, then the remaining portions of the contract are enforceable."

II. *Tortious Interference with the Employment Contract*

■ Appellants further assert that the lower court erred in finding that Holladay–Tyler tortiously interfered with the restrictive covenant in the employment contract between Printers and Fowler. Tortious interference with an existing contract has long been recognized as a cause of action in Maryland. *See Gore v. Condon*, 87 Md. 368, 376, 39 A. 1042 (1898) ("a man who induces one of two parties to a contract to break it, intending thereby to injure the other or to obtain a benefit for himself, does the other an actionable wrong"). This tort has five elements: (1) existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff. *See K & K Management v. Lee*, 316 Md. 137, 155–156, 557 A.2d 965 (1989); *Vane v. Nocella*, 303 Md. 362, 383 n. 6, 494 A.2d 181 (1985); *Wilmington Trust Co. v. Clark*, 289 Md. 313, 329, 424 A.2d 744 (1981); Restatement (Second) of Torts, §§ 766, 766A, 767 (1981).

■ As discussed above, there was a valid, enforceable covenant that restricted Fowler from soliciting the customers of Printers. Moreover, there was abundant evidence that this covenant was breached by Fowler and that Holla-

day–Tyler knew of the covenant. Furthermore, as discussed *infra,* the trial court's holding that damages resulted to Printers because of Holladay–Tyler's conduct was not clearly erroneous. Thus, there was sufficient evidence to support the first, second, fourth and fifth elements of the tort.

Although not phrased precisely this way, appellants' essential claims are that: (1) there was insufficient evidence to prove the third element of the tort; and (2) even if all elements were proved, Holladay–Tyler's conduct was justified. Specifically, appellants assert that Holladay–Tyler did not interfere with the employment contract because it did not induce Fowler to breach it; it simply hired a competitor's employee.[6] They point to the fact that no Maryland court has ever held a new employer to have tortiously interfered with an employee's contract with a former employer as evidence that such conduct is not wrongful but rather entirely justified competition. Because these claims are so interconnected, we consider them together.

 It is well established that a defendant may avoid liability for tortious interference with a contract by proving that its conduct was justified or excused in some way. *Sharrow v. State Farm Mutual,* 306 Md. 754, 764–65, 511 A.2d 492 (1986). Restatement (Second) of Torts, § 768 and its comments address the question of when competition constitutes justification. Section 768 provides as follows:

---

6. Appellants also claim that Holladay–Tyler's conduct was justified because the company believed that the nonsolicitation clause was unenforceable. This is no defense. *See Daugherty v. Kessler,* 264 Md. 281, 287–88, 286 A.2d 95, 98–99 (1972); *Stannard v. McCool,* 198 Md. 609, 618, 84 A.2d 862 (1951) (both citing Restatement Torts § 766(e)) (if a defendant has knowledge of the facts concerning plaintiff's contractual rights, he is "subject to liability even though he is mistaken as to their legal significance and believes that there is no contract or that the contract means something other than what it is judicially held to mean.") *See also, Mixing Equipment Co. v. Philadelphia Gear, Inc.,* 436 F.2d 1308, 1315 (3d Cir.1971); *United Laboratories v. Kuykendall,* 332 N.C. 643, 663, 370 S.E.2d 375, 388 (1988).

(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

(a) the relation concerns a matter involved in competition between the actor and the other and

(b) the actor does not employ wrongful means and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

Thus, if a contract is terminable at will, as this contract arguably is,[7] a competitor who induces breach of it to serve his own competitive purpose does not interfere improperly unless the competitor employs wrongful means or creates a restraint of trade.

■■■ Comment i to § 768 addresses the precise situation involved here:

An employment contract, however, may be only partially terminable at will. Thus it may leave the employment at the employee's option but provide that he is under a continuing obligation not to engage in competition with his former employer. Under these circumstances a defendant engaged in the same business might induce the

---

**7.** Printers claims that the contract provides that Fowler can only be terminated for cause, and the lower court so found. The contract does provide for termination for "just cause"; however, it defines "just cause," *inter alia*, as "failure by Employee for any reason, within two (2) days after receipt by Employee of written notice thereof from Employer to correct ... any ... act *which Employer believe[s], in its sole discretion,* does or may adversely affect its business or operations" (emphasis added).

employee to quit his job, *but he would not be justified in engaging the employee to work for him in an activity that would mean violation of the contract not to compete.*

(emphasis added.) This comment clarifies two matters significant to resolution of this case. First, contrary to appellants' claims, a former employer can recover from a new employer for tortiously interfering with an employee's covenant not to compete. A number of cases have so held. *See, e.g., Barnes Group, Inc. v. C & C Products,* 716 F.2d 1023 (4th Cir.1983); *Mixing Equipment Co. v. Philadelphia Gear, Inc.,* 436 F.2d 1308 (3d Cir.1971); *Premix, Inc. v. Zappitelli,* 561 F.Supp. 269 (N.D.Ohio 1983); *Koehler v. Cummings,* 380 F.Supp. 1294 (M.D.Tenn.1971); *Certified Laboratories of Texas v. Rubinson,* 303 F.Supp. 1014 (E.D.Pa.1969); *United Laboratories, Inc. v. Kuykendall,* 322 N.C. 643, 370 S.E.2d 375 (1988); *Mills v. Murray,* 472 S.W.2d 6, 13 (Mo.App.1971); *Morgan's Home Equipment Corp. v. Martucci,* 390 Pa. 618, 136 A.2d 838 (1957).

▮ The second important point crystallized in this comment is that a new employer need not actively induce an employee to quit her job. Nor must a new employer even have knowledge of the restrictive covenant in the employee's previous contract, when it hires her, in order to incur liability for tortious interference with that covenant. Rather, the central question is whether, upon learning of the restrictive covenant that binds its new employee, the new employer nevertheless "engages the employee to work for him in an activity that would mean violation of the contract not to compete." *Compare Arabesque Studios v. Academy of Fine Arts,* 529 S.W.2d 564 (Tex.Civ.App. 5 Dist.1975) (no evidence that new employer was *aware of continuing breach* of non-compete clause and so no liability for tortious interference with it) *with Mattison v. Johnston,* 152 Ariz. 109, 730 P.2d 286 (App.1986) (even though new employer did not induce beauty salon employee to breach at will employment relationship, grant of summary judgment to new employer reversed because it was alleged that new employ-

er had interfered with restrictive covenant). *See also Island Air, Inc. v. Les La Bar*, 18 Wash.App. 129, 566 P.2d 972, 980 (1977) ("Disregard for a valid restrictive covenant cannot be endorsed").

This principle—that inducement to breach the employment contract is not necessary for the tort if a new employer knowingly "engages the employee to work for it in an activity which would mean a violation of the contract not to compete"—is entirely in accord with the approach to the third element of the tort taken by the Court of Appeals. The Court has noted with approval the position set forth in the Restatement of Torts that there is "no technical requirement as to the kind of conduct" that is needed to constitute interference with contract; moreover, it is "not necessary to show a third party was induced to break the contract." *Sharrow*, 306 Md. at 767, 511 A.2d 492 (*quoting* Restatement (Second) of Torts § 766, comment k). Rather, any act by defendant which is "wrongful or unlawful ... done intentionally without cause or excuse," which is " 'for the indirect purpose of injuring the plaintiff, or of benefitting the defendant at the expense of the plaintiff,' " will constitute tortious interference. *Sharrow*, 306 Md. at 764–65, 511 A.2d 492 (*quoting Knickerbocker Co. v. Gardiner Co.*, 107 Md. 556, 565, 69 A. 405 (1908)). *See also Orfanos v. Athenian*, 66 Md.App. 507, 522, 505 A.2d 131 (1986); W. Prosser, *Law of Torts* § 129, at 991 (5th ed. 1971) ("actual inducement is not necessarily required at all ... interference with contract may be quite sufficient for liability, provided always that the interference was unjustified").

In suits by a former employer against a subsequent employer, courts have held that a variety of factors, no one of which alone is controlling, contributes to the decision as to whether a new employer has committed "wrongful acts" for the purpose of benefitting itself at the expense of the old employer and so tortiously interfered with a restrictive covenant. Among those factors are whether the new employer hired the employee knowing of the restrictive covenant; whether the new employer capitalized on certain

accounts or information held by the employee but protected by a restrictive covenant; whether the new employer encouraged the employee to contact the customers of the old employer; whether, after injunctive relief was awarded against the employee, the new employer itself solicited business from the old employer's customers; and, generally, whether the new employer acquiesced in or benefitted from the wrongs of the new employee. *See Barnes Group, Inc. v. C & C Products,* 716 F.2d at 1027–28 n. 5; *Mixing Equipment Co. v. Philadelphia Gear, Inc.,* 436 F.2d at 1314–1315; *Koehler v. Cummings,* 380 F.Supp. at 1310; *Certified Laboratories of Texas v. Rubinson,* 303 F.Supp. at 1025; *United Laboratories, Inc. v. Kuykendall,* 370 S.E.2d at 386–388. *See also Group Ass'n Plans, Inc. v. Colquhoun,* 466 F.2d 469, 471 (D.C.Cir.1972) ("A company which knowingly participates in, encourages, and accepts the benefits of, acts of unfair competition committed by a person against a former employer is liable for those acts"); *American Republic Insurance Co. v. Union Fidelity Insurance Co.,* 295 F.Supp. 553, 556 (D.Or.1968) (same); *Bancroft–Whitney Co. v. Glen,* 64 Cal.2d 327, 49 Cal.Rptr. 825, 844–45, 411 P.2d 921, 940–41 (1966) (new employer that "cooperated" with an employee in his breach of fiduciary duty to former employer and "received the benefits" thereof, cannot "disclaim the burden" of liability).

All of these factors but the first are present in the case at hand. It is true that here the new employer, Holladay–Tyler, hired the employee, Fowler, without knowledge of the restrictive covenant in Fowler's contract with her former employee, Printers. Within five working days, however, Holladay–Tyler was notified in writing of the covenant and expressly warned that Fowler was to cease and desist from violating its terms, or she and Holladay–Tyler would be held responsible for any resulting damages. Thus, Holladay–Tyler was on formal written notice of the nonsolicitation clause *prior* to deciding to subsidize and/or assist Fowler in violating it. In light of this notice, Holladay–Tyler had a variety of legitimate options: it could have

discharged Fowler; it could have sought the legal release of Fowler from the restrictive covenant; or it could have permitted her to continue work, but only within the scope of her contract with Printers. Instead, Holladay–Tyler, for the entire year covered by the nonsolicitation clause, encouraged and subsidized Fowler in contacting Printers' customers, socializing with them, and cultivating new business relationships akin to those which they had with Printers. Thus, it determined to assist and subsidize Fowler knowing that her activities violated the nonsolicitation clause. Moreover, after Fowler was specifically enjoined by the circuit court from contacting Printers' customers, Holladay–Tyler not only solicited those customers itself, it also continued to assist and subsidize Fowler in her efforts to socialize with and cultivate them.

In sum, there was evidence from which the trial court could have found that Holladay–Tyler's conduct was "wrongful or unlawful" and done for the indirect purpose of benefitting itself at the expense of Printers. *Sharrow,* 306 Md. at 764–66, 511 A.2d 492. Additionally, the evidence supported the conclusion by the lower court that Holladay–Tyler engaged Fowler to work for it "in an activity that would mean violation" of the nonsolicitation clause. Restatement (Second) of Torts § 768, comment i. Thus, the trial court did not err in holding that Holladay–Tyler tortiously interfered with the nonsolicitation covenant.

III. *The Correctness of the Damages Awarded:* [8]

1. Lost Profits

■ The measure of damages for breach of contract under Maryland law is that set forth in *Sloane, Inc. v. House & Associates,* 311 Md. 36, 42, 532 A.2d 694 (1987):

the injured party has a right to damages based on his expectation interest as measured by

---

8. We address in this section both the challenges to the damage award made by the appellants and the challenge made by Printers in its cross appeal.

(a) *the loss in the value to him of the other party's performance caused by its failure or deficiency, plus*

(b) *any other loss,* including incidental or consequential loss, *caused by the breach,* less

(c) any cost or other loss that he has avoided by not having to perform

(Citing Restatement (Second) of Contracts § 347 (1981) (emphasis added)). Expectancy damages for breach of a covenant not to compete generally are the profits that would have been realized had no breach occurred. *See National Micrographics v. OCE–Indus.*, 55 Md.App. 526, 532, 465 A.2d 862 (1983), *cert. denied*, 298 Md. 395, 470 A.2d 353 (1984). These lost profits must be proved with "reasonable certainty." *Id.*

 In *Rite Aid Corp. v. Lake Shore Inv.*, 298 Md. 611, 620–21, 471 A.2d 735 (1984) the Court of Appeals expressly adopted as law in Maryland the section of the Restatement of Torts that deals with damages for "interference with a contract or prospective contractual relation." The *Rite Aid* Court stated:

"[S]uch damages as would reasonably flow from a tortious contractual interference" may include the *pecuniary loss of the benefits of the contract, consequential losses for which the tortious act is the legal cause,* emotional distress and actual harm to reputation, if they are reasonably to be expected to result from the tortious act, and, in appropriate circumstances, punitive damages.

*Id.* at 621–22, 471 A.2d 735 (summarizing Restatement (Second) of Torts § 77A (1984) (emphasis added)). Accordingly, Printers was entitled to recover lost profits as consequential damages from Fowler for breach of the contract, *and* from Holladay–Tyler for tortious interference with the contract.

Printers sought to recover only the profits lost on eight specific accounts upon which Fowler had worked while at Printers and which followed her to Holladay–Tyler. The lower court found no evidence to support an award o.

damages as to three of them. Of the remaining five accounts, there was abundant evidence that Fowler's solicitation of them had caused their transfer of business to Holladay–Tyler. All of these accounts had employed Printers to do printing work for more than one year prior to Fowler's departure. One of the accounts, Best, had been actively solicited by Holladay–Tyler but had awarded it *no* business in the two years before Fowler joined that firm; all of the other accounts had *never*, before Fowler's arrival, awarded any business to Holladay–Tyler.

The lower court determined the amount of damages by taking the gross value of each printing job performed for these five accounts by Holladay–Tyler during the one year period covered by the restrictive covenant and subtracting the variable, but not fixed, costs which would have been incurred by Printers if it had performed the job. The "lost profits" so calculated by the circuit court were as follows:

| Printing Job | Profit |
|---|---|
| Best (September Cookware) | $ 8,023.00 |
| NRA (Coloring Book) | 6,948.00 |
| Best (Kids Catalogue) | 76,469.00 |
| Best (Lab Store) | 34,261.00 |
| Best (Luggage Flyer) | 6,794.00 |
| Pittsburgh Magazine | 158,880.00 |
| Best (misc.) | 5,953.00 |
| Kay Jewelers | 30,674.00 |
| U.S. Pharmacopeia | 24,784.00 |
| Best (June Camera) | 8,190.00 |
| | $360,976.00 |

Appellants claim that the circuit court erred "in four ways" in calculating the damages award.

■ Their principal claim of error is that these accounts had not been profitable to Printers before Fowler left and so the loss of these accounts cannot result in a loss of profits to Printers. The factual predicate for this argument is the response to a request for an admission in which Printers "denied" that Fowler accounts at Printers "showed

a profit" in fiscal years 1988 or 1989. In determining its profits in 1988 and 1989 and so in answering the discovery request, Printers had to consider whether income exceeded all costs—fixed costs and variable costs. Since income did not exceed *all* costs, no account was profitable in this sense. When a party is suing for breach of contract, however, fixed costs "need not be deducted from gross income to arrive at lost profit properly recoverable." *Sloane*, 311 Md. at 50, 532 A.2d 694. There was abundant evidence presented at trial that Printers had very high fixed costs. Printers' expert, whose testimony the trial judge expressly found entitled to "greater weight" than appellants' expert, opined that the amounts set forth above were lost profits to Printers, *i.e.*, income it would realize after deducting from gross income all increased variable costs necessary to perform this additional work, but without deducting any fixed costs. Accordingly, appellants' primary argument as to damages fails. *See Sloane*, 311 Md. at 52, 532 A.2d 694 ("it is immaterial how much of the damages award represents net profit, if any, and how much represents recovery of so much of the contract price as would have been used to offset fixed costs").

Appellants also assert that the trial judge erred in his calculations of lost profits because he failed to consider that: (1) much of the printing business was obtained on "the basis of bids"; (2) Printers did not have the technology to perform some of the jobs; and (3) some of the customers testified that they would not have selected Printers to perform their work in any event. Our examination of the voluminous record indicates that the trial court carefully considered each of these factors. Although many of these contracts were obtained by bid, there was substantial evidence that Fowler's contacts with the customer gave her employer (whether it be Printers or Holladay–Tyler) access to specifications and opportunities to bid that were not generally available. Moreover, while there was evidence that Printers did not have the technology to perform some printing jobs, the trial judge did not permit Printers to

recover for profits lost on those jobs, but rather limited its award to recovery for profits lost for jobs Printers could have done entirely by itself, or partly by itself and partly by subcontracting the jobs. Finally, although representatives of Kay Jewelers and Pittsburgh Magazine did testify that they would not have used Printers in the future even had Fowler not left, the trial judge was certainly free to find this testimony not credible in light of the fact that these companies had been Printers' customers for some time and had never, before Fowler left, given any work to Holladay–Tyler.

■■■ Printers' cross-appeal of the circuit court's award of lost profits is equally meritless. Printers claims that the trial judge should have based this award on the work performed by Printers for the stipulated accounts in 1989, rather than the work performed for them by Holladay–Tyler in 1990. Printers suggests that the lower court should have extrapolated from the former figure and awarded $745,394 in lost profits, rather than the $360,976 which it did award. "Evidence of past profits in an established business furnish a reasonable basis for future profits"; however, "profits made by others ... in a similar business or under similar contract ... may also afford a reasonable inference of the plaintiff's loss." 11 W. Jaeger, *Williston on Contracts*, § 1346A (3d ed. 1968) (footnotes omitted).[9] *Both* are among the "recognized methods" used "in proving lost profits." *Id.* Moreover, these methods are not "mutually exclusive but often one method is more feasible than others." *Id.*

The method used by the lower court appears to be the one "more feasible" here. It is the one more likely, in this case, to assess with "reasonable certainty" Printers' lost profits. There was substantial evidence that Printers' lack of equipment and resources might well have resulted in a decrease in its business in 1990, even if Fowler had remained at

---

9. In *Sloane,* the Court of Appeals specifically cited and quoted from this section of Williston. *See Sloane,* 311 Md. at 41–42, 532 A.2d 694.

Printers. Thus, extrapolation from Printers' previous year's figures might well have been too speculative to be appropriate. *See Macke Co. v. Pizza of Gaithersburg Inc.,* 259 Md. 479, 270 A.2d 645 (1970) (court remanded case for a new trial on damages noting "a more appropriate measure of damages might be that grounded" on the defendant's *"actual experience* for the [post breach] period, *rather than one based on extrapolating profits* from results experienced" by the plaintiff in the prebreach period). In any event, we cannot conclude that the court below erred in the method or amount of lost profits it awarded.

2. Good Will

In addition to lost profits, Printers sought to recover $500,000 in damages for loss of good will as a result of Fowler's breach of contract and Holladay–Tyler's interference with contract. The lower court awarded it $50,000, finding that Printers "has sustained a permanent loss of good will as a result" of Fowler's and Holladay–Tyler's actions and that Printers "has not been able to recapture any significant business with those accounts since Ms. Fowler's exodus from the company." The court below did not further detail the basis for this award. Appellants claim that it must be erroneous because, they assert, "it was uncontested that, at the time in question, Printers II had no quantifiable good will," and so this award for good will must be based on "the same accounts for which" Printers "sought damages for lost profits."[10]

"Good will" has been discussed in Maryland cases. *See, e.g., Prahinski v. Prahinski,* 321 Md. 227, 232–33, 582 A.2d 784 (1990); *Hagan v. Dundore,* 187 Md. 430, 442, 50 A.2d 570 (1947) (citing *Brown v. Benzinger,* 118 Md. 29, 84 A. 79 (1912) for definitions of good will ("The probability that the old customers will resort to the old place") (*quoting Cruttwell v. Lye,* 34 Eng.Rep. 129, 134 17 Ves.Jr. 335, 346 (1810)) and ("those advantages which may inure to the purchaser

---

**10.** Printers does not cross appeal on this portion of the damage award.

from holding himself out to the public as succeeding to an enterprise which has been identified in the past with the name and repute of his predecessor") (*quoting Knoedler v. Boussod,* 47 F. 465, 466 (S.D.N.Y.1891), *aff'd,* 55 F. 895 (2d Cir.1893)); *Hollander v. Hollander,* 89 Md.App. 156, 597 A.2d 1012 (1991). No Maryland court, however, has ever considered the question of whether, and under what circumstances, damages can be awarded for the loss of good will.

Most cases in which other courts have permitted good will damages have involved either the sale of goods under the Uniform Commercial Code (or its predecessors), *AM/PM Franchise v. Atlantic Richfield,* 526 Pa. 110, 584 A.2d 915, 925 (1990) (and cases cited therein); *Isenberg v. Lemon,* 84 Ariz. 340, 327 P.2d 1016, *rev'd on rehearing* 84 Ariz. 364, 329 P.2d 882 (1958), *or* the sale of a business. *See, e.g., Mohawk Maintenance Co., Inc. v. Kessler,* 52 N.Y.2d 276, 437 N.Y.S.2d 646, 651, 419 N.E.2d 324, 329 (1981); *Leiman–Scott, Inc. v. Holmes,* 142 Mont. 58, 381 P.2d 489 (1963); *Vancil v. Anderson,* 71 Idaho 95, 227 P.2d 74 (1951); *Wood v. Pender–Doxey,* 151 Va. 706, 144 S.E. 635 (1928). In the first situation, "good will damages refer to profits lost on future sales rather than sales of defective goods themselves." *AM/PM Franchise,* 584 A.2d at 920. In the second, good will is often expressly valued in the contract for the sale of the business, and is always a recognized element of that sale. *Dunn v. Ward,* 105 Idaho 354, 670 P.2d 59 (1983). Accordingly, these precedents provide little authority for the good will damages awarded here and the discussion of good will in these situations is not very helpful here.

We have found only one case with facts similar to those at hand in which a court did permit the award of good will damages. *Orkin Exterminating Co. Inc. v. Burnett,* 160 N.W.2d 427 (Iowa 1968). There the court did not award any damages for loss of profits. *Id.* at 430. *See also Dunn v. Ward,* 670 P.2d at 62 (loss of good will can "be measured by the amount of profits lost to the buyer as a result of the breach"); *Wood v. Pender–Doxey,* 151 Va. at 710, 144 S.E.

635 (award for loss of good will; no separate award for lost profits). Accordingly, there is some, at least implicit, support for appellants' argument that Printers should not be awarded damages both for lost profits and loss of good will.

■■■ We do not decide this question of first impression here, however, because there is another, clearer, reason why the good will award must be reversed. It was not based on any evidence; rather it was entirely speculative and conjectural. Only damages which have been "affirmatively proved with reasonable certainty" can be recovered in a tort action, *Jones v. Malinowski*, 299 Md. 257, 269, 473 A.2d 429 (1984). Similarly, if "the record sets forth no basis on which damages could have been assessed," they cannot be recovered in a contract action. *Yarnick v. King*, 259 Md. 241, 250, 269 A.2d 607 (1970).

Even Printers can point to no place in the record in which there was any evidence before the trial judge to support the award of $50,000 for loss of good will. For example, although both sides relied on expert testimony, no expert was asked or volunteered his opinion as to whether, and/or in what amount, Printers suffered a loss of good will. Since there was no basis for the award, the portion of the court's order assessing $50,000 in good will damages is reversed.

## IV. *Failure to Award Damages for Fowler's Attempt to Hire a Printers' Employee*

On cross-appeal, Printers asserts that the trial court erred in failing to award it additional damages because of Fowler's alleged breach of another portion of the employment agreement. Specifically, Printers claims that it also proved the breach of the clause in the employment agreement in which she promised "not [to] directly or indirectly, hire or engage, or attempt to hire or engage" any employ-

ees of Printers during the year following her termination.[11]

There was evidence from which the trial court could have concluded that Fowler, three months after leaving Printers, attempted to hire, for Holladay Tyler, a Printers estimator. Fowler conceded that she set up an interview at Holladay–Tyler for the estimator and introduced him to the head of the estimating department at Holladay–Tyler. Appellants claim that the trial judge was free to reject this claim because: (1) "all formal contact with Holladay–Tyler was with persons other than Ms. Fowler"; and (2) the estimator ultimately made the decision to stay with Printers—albeit only after Printers increased his salary by $4,000 in response to the Holladay–Tyler offer.

Perhaps this is so. Perhaps the circuit court determined that Fowler did not breach this portion of the contract and/or that Printers was not damaged by any breach. This is not, however, at all clear from the circuit court's opinion. All that is clear on this point from the lower court's opinion is that it made *no* finding with regard to this claim.[12] In "cases tried by the court, without a jury, it is the duty of the court to pass on all issues raised by the pleadings and evidence material to a determination of the case, and a failure to do so is error." 89 C.J.S.2d, "Trial" § 603(b) at p. 418 and cases cited therein. Accordingly, we must remand the case for determination of this issue by the circuit court.

## V. *Denial of Sanctions*

After trial, Printers moved for sanctions pursuant to Maryland Rule 1–341. Rule 1–341 enables a trial court to

---

**11.** Appellants make no claim that this portion of the covenant was unenforceable for any reason. *See Ecolab, Inc. v. K.P. Laundry Machinery, Inc.,* 656 F.Supp. 894, 897 (S.D.N.Y.1987); *E.D. Lacey Mills v. Keith,* 183 Ga.App. 357, 359 S.E.2d 148, 155 (1987).

**12.** It is easy to understand how, in light of the long trial, numerous witnesses, and welter of documentary evidence, the court below could have inadvertently neglected such a finding.

award one party costs, including reasonable attorney's fees, if the court finds that the conduct of the other party "in maintaining or defending any proceeding was in bad faith or without substantial justification." Printers claimed that assertions made by Fowler in a detailed affidavit she submitted in opposition to Printers' earlier motion for an injunction, which ultimately proved to be false and misleading in light of the evidence presented at trial, demonstrated that at least portions of her defense of the case were pursued in bad faith and without substantial justification. Pursuant to Rule 2–311(f), Printers requested a hearing on the sanctions. On January 8, 1991, without holding any hearing on the matter, the circuit court, in a brief order, denied Printers' motion for sanctions, noting that the denial was "after consideration of the record and the memoranda of the parties." Printers appeals the denial of sanctions, asserting that the trial court abused its discretion in refusing to impose sanctions and erred in neither conducting the hearing as requested by Printers, nor articulating the reasons for its decision. Printers asks us to vacate the trial court's order and remand to the trial court with instructions either: (1) to impose sanctions on Fowler or (2) to conduct a hearing and issue findings.

We decline to follow the first course. The trial court is the proper tribunal to make determinations as to whether actions before it have been brought in "bad faith" or "without substantial justification." *Century I Condo. Ass'n v. Plaza Condo. Joint Ven.*, 64 Md.App. 107, 115, 494 A.2d 713 (1985); *Colonial Carpets, Inc. v. Carpet Fair, Inc.*, 36 Md.App. 583, 591, 374 A.2d 419 (1977). No claim is made that Fowler's *appeal* is similarly so meritless as to require imposition of sanctions. *Compare Blanton v. Equitable Bank Nat'l Ass'n*, 61 Md.App. 158, 165, 485 A.2d 694 (1985) (sanctions awarded upon appellate court's finding that appeal was without substantial justification). Accordingly, it is inappropriate for us to make any determination in the first instance as to whether sanctions should be granted.

Printers' alternative request, remand for a hearing and/or fact finding, raises questions of first impression in Maryland. There have been numerous reported cases interpreting Rule 1–341 since its adoption in 1984.[13] *See, e.g., Nast v. Lockett,* 312 Md. 343, 371, 539 A.2d 1113 (1988) (sanctions should be imposed where claims for punitive damages are made in bad faith or without substantial justification); *Bastian v. Laffin,* 54 Md.App. 703, 717–20, 460 A.2d 623 (1983) (attorneys fees intended to compensate a defendant as well as plaintiff for the consequences of improper conduct); *Shanks v. Williams,* 53 Md.App. 670, 672–73, 455 A.2d 450 (1983) (award of counsel fees in proceeding "without substantial justification" affirmed). A number of these cases address the proper procedure under the rule. *See, e.g., Phillips v. Venker,* 316 Md. 212, 218–19, 557 A.2d 1338 (1989); *Newman v. Reilly,* 314 Md. 364, 374 n. 10, 550 A.2d 959 (1988); *Blanton,* 61 Md.App. at 166, 485 A.2d 694. None, however, has dealt with the precise questions raised here.

### 1. Hearing

Constitutional due process principles apply to the assessment of attorney's fees for litigation misconduct. *Zdravkovich v. Bell Atl–Tricon Leasing,* 323 Md. 200, 209, 592 A.2d 498 (1991); *Talley v. Talley,* 317 Md. 428, 434–35, 564 A.2d 777 (1989); *Johnson v. Baker,* 84 Md.App. 521, 538, 581 A.2d 48 (1990), *cert. denied,* 322 Md. 131, 586 A.2d 13 (1991); *Needle v. White,* 81 Md.App. 463, 480, 568 A.2d 856, *cert. denied,* 319 Md. 582, 573 A.2d 1338 (1990). Thus, due process requires "at a minimum, that before sanctions are imposed pursuant to Rule 1–341, there must be notice and an opportunity to respond." *Zdravkovich,* 323 Md. at 209, 592 A.2d 498. There is, however, no due process right

---

**13.** Rule 1–341 was derived from former Rule 604b. For a discussion of the similarity and differences between Rule 1–341 and Rule 604 b, see *Blanton v. Equitable Bank Nat'l Ass'n,* 61 Md.App. 158, 160–62, 485 A.2d 694 (1985).

to a *hearing* on a Rule 1–341 motion.[14] *See, e.g., Newman v. Reilly,* 314 Md. 364, 374, 550 A.2d 959 (1988) (granting of sanctions in the absence of a hearing was proper where the movant's request for a hearing was untimely); *Hess v. Chalmers,* 33 Md.App. 541, 544, 365 A.2d 294 (1976) (denial of sanctions without hearing and without written exchange, as requested by movant, upheld). Indeed, although we recently held that the constitutional considerations which may arise in a dispute over sanctions suggest that *before sanctions are awarded,* "[a] party should be provided fair notice and an opportunity to be heard on the record," even in that situation no evidentiary hearing is necessary. *Johnson v. Baker,* 84 Md.App. at 538, 581 A.2d 48. Nor is there anything in Rule 1–341 itself that requires a trial court to hold a hearing.

Thus, the only possible source of a *right* to a hearing on a Rule 1–341 motion for sanctions, in a case when sanctions are denied, is Rule 2–311(f). That rule provides in pertinent part:

> Except when a rule expressly provides for a hearing, the court shall determine in each case whether a hearing will be held, but it may not render a decision that is dispositive of a claim or defense without a hearing if one was requested as provided in this section.

---

**14.** Similarly, due process does not *require* a hearing prior to an award of fees pursuant to Federal Rule of Civil Procedure 11. Federal case law restricts the right to a hearing to those cases in which "a hearing could assist the court in its decision." *Kapco Mfg. Co., Inc. v. C & O Enterprises, Inc.,* 886 F.2d 1485, 1494–95 (7th Cir.1989); *see also* 5A Wright & Miller, *Federal Practice and Procedure,* Civil 2d § 1337 (Because the court may decide the matter on the basis of the record and the judge's own observation of the conduct of the litigation, a hearing may not be necessary to dispose of the motion). Indeed, federal law permits the actual award of sanctions—which surely involves a deprivation more severe than the mere denial of sanctions—without a hearing. *See, e.g., Markwell v. County of Bexar,* 878 F.2d 899 (5th Cir.1989) (where judge was familiar with conduct of parties and paper record and position of parties was detailed at length in writing, award of sanctions without hearing was not abuse of discretion).

Thus, Rule 2–311(f) only requires a hearing if a decision denying sanctions is dispositive of a "claim" or "defense." Whether a motion for sanctions, pursuant to Rule 1–341, constitutes a "claim" under Rule 2–311(f) has not been addressed by the Court of Appeals. *See Newman v. Reilly,* 314 Md. at 374, n. 10, 550 A.2d 959 (*"Even if* a post judgment motion for sanctions under Rule 1–341 is a 'claim' within the meaning of Rule 2–311(f), the [trial] court was free to dispose of the claim and of the defense thereto without a hearing," where no hearing was requested) (emphasis added). Nor has this precise question been considered, to date, by the Standing Committee on Rules of Practice and Procedure, as evidenced by the absence of any discussion of this matter in its Minutes.

Those Minutes do reveal, however, that the Rules Committee intended that, generally, the decision as to whether a motion requires a hearing was to be left to the discretion of the trial judge:

> ... it was the consensus that most motions are frivolous or dilatory in nature. It is principally an administrative problem which can best be handled by a motions judge in chambers; whether a hearing is required should be left to the judge's discretion.

Minutes of Meeting of Standing Committee on Rules of Practice and Procedure of October 12–13, 1979 at p. 13 ("Minutes of October 1979"). *See also* Letter of John F. McAuliffe, Chairman of the Standing Committee on Rules of Practice and Procedure, to the Court of Appeals of Maryland, dated August 1, 1983 at 3 ("It is the Committee's intent that the court be permitted to dispose of motions without hearings whenever a hearing is not deemed necessary and the ruling the court determines to be appropriate is not dispositive of a claim or defense. *The provisions of Rule 2–311 are designed* to foster careful preparation of the motions and responses that are filed for the courts consideration and *to eliminate all unnecessary hearings"*). (emphasis added).

 Accordingly, a subcommittee of the Rules Committee recommended that "hearings on motions be discretionary with the [trial] judge." Minutes of October 1979 at p. 14. This recommendation was amended by the Committee to provide that:

> where a ruling on the motion would be *dispositive of the case* the movant was entitled to a hearing as a matter of right.

*Id.* (emphasis supplied). The Minutes reflect that this language "after some discussion" was "restated" (not amended, revised or changed) by the Committee to the "claim or defense" language now found in the rule, *i.e.:*

> If the ruling is *dispositive of the claim or defense,* the party affected is entitled to a hearing as a matter of right and the court will set the motion down for a hearing.[15]

*Id.* (emphasis supplied). This history of the language of the rule suggests that the requirement that a hearing be held if the ruling is dispositive of a "claim" or "defense" was intended to be a "claim" or "defense" intrinsic to the underlying cause of action, *i.e.,* those dispositive "of the case," like motions for summary judgment and motions to dismiss, and not collateral claims or defenses like those involving sanctions or discovery matters.

Moreover, when Rule 2–311(f) is read in context with the other pleadings and motions rules in Chapter 300, this conclusion is confirmed. Although the "claim" or "defense" language of subsection (f) is not found elsewhere in Rule 2–311, one or both of these terms is found in many of the pleadings and motions rules immediately preceding or following Rule 2–311, all of which were originally adopted by the Court of Appeals at the same time as Rule 2–311(f). *See, e.g.,* Rules 2–303(a) and (c), Rule 2–321(a), Rule 2–322, Rule 2–304(c), Rule 2–305, Rule 2–323, Rule 2–324, Rule 2–325, Rule 2–327, Rule 2–331, Rule 2–332, and Rule 2–341. Throughout the pleadings and motions rules, "claim" ap-

---

**15.** Much of the remainder of this language was revised later; although its substance is largely unchanged. *See* Md. Rule 2–311(f).

pears to be used as a term of art synonymous with "cause of action."[16] *See Weber v. Unsatisfied Claim & Jud. Fund Bd.,* 261 Md. 457, 460–61, 276 A.2d 86 (1971). "Defense" is similarly used as a term of art designating a legal basis for avoiding or defeating a "claim" or cause of action. *See, e.g.,* Rule 2–323(f) and (g) (listing negative and affirmative defenses). Not one of the other pleadings and motions rules in Chapter 300 in any way suggests a broader meaning for "claim" or "defense," *i.e.,* that these terms are to include the arguments made in order to obtain or thwart collateral litigation matters, like those contained in motions for discovery sanctions, motions for protective orders, or motions for sanctions under Rule 1–341.

In sum, both the history and context of Rule 2–311(f) strongly suggest that a "claim" or "defense," the disposition of which requires a hearing, is a "claim" or "defense" involving a cause of action, not one involving an argument on matters collateral to that cause of action. Accordingly, we conclude that Rule 2–311(f) does not require that a trial judge hold a hearing prior to denying a motion for sanctions requested pursuant to Rule 1–341. Thus, the fact that the circuit court held no hearing here was not error.

### 2. Fact Finding

With regard to fact finding, *"[b]efore* a court metes Rule 1–341 sanctions, it must make an evidentiary finding of 'bad faith' or 'lack of substantial justification.' " *Talley,* 317 Md. at 436, 564 A.2d 777 (*quoting Legal Aid Bureau v. Bishop's Garth,* 75 Md.App. 214, 220, 540 A.2d 1175, *cert.*

---

**16.** Indeed, the Minutes of the Rules Committee indicate that, at one time, the Committee considered the use of the term "cause of action" rather than "claim." *See* Minutes of the Standing Committee on Rules of Practice and Procedure dated May 11–12, 1979 at p. 22–23. Apparently, the Committee ultimately decided instead on the use of the term "claim" which was consistent with the federal practice. *See id.* at p. 22. The Committee's discussion of the two terms as alternatives, however, provides further evidence of the narrow meaning to be given "claim" in the rules.

*denied,* 313 Md. 611, 547 A.2d 188 (1988) (emphasis added)). *See also Inlet Associates v. Harrison Inn Inlet, Inc.,* 324 Md. 254, 596 A.2d 1049 (1991). Where the trial court's grant of sanctions was at least partially in error, we have remanded the case for findings by the lower court as to whether and to what extent fees should have been granted. *See Miller v. Miller,* 70 Md.App. 1, 13, 519 A.2d 1298 (1987). On the other hand, although recognizing that "ordinarily, a trial judge faced with a Rule 1-341 motion should make an explicit determination" as to the existence of "bad faith and lack of substantial justification," we have upheld a trial court's summary denial of a request for sanctions after concluding, upon review of the record, that there was no basis for them. *Century I,* 64 Md.App. at 115-17, 494 A.2d 713.

Neither we nor the Court of Appeals has ever set forth any guiding principle as to when, if ever, a trial court must make express findings as to bad faith and/or lack of substantial justification when *denying* sanctions. It seems clear, as we have indicated in earlier holdings, *e.g., Century I,* 64 Md.App. at 115-17, 494 A.2d 713; *Hess v. Chalmers,* 33 Md.App. at 545-46, 365 A.2d 294, that if the Rule 1-341 motion is patently groundless, *i.e.,* if there is no basis for granting it apparent from the record, the trial judge need not issue any findings. Where, however, the record does not clearly reflect the meritlessness of the Rule 1-341 motion, the trial court must make findings as to bad faith and/or substantial justification when denying the motion. Without such a finding, it is impossible for an appellate court to review the circuit court's decision.

In the case at hand, it is not clear from the record that the Rule 1-341 motion was meritless. Accordingly, we remand the matter to the circuit court so that it can make the required findings of fact. We note that the balance we have struck and principle we have enunciated here are consistent with the standard adopted by federal appellate courts that have reviewed analogous questions under Federal Rules of Civil Procedure 11. *See, e.g., Straitwell v.*

*National Steel Corp.,* 869 F.2d 248, 253 (4th Cir.1989) (viable claim for sanctions remanded to trial court for findings of fact); *Szabo Food Service, Inc. v. Canteen Corp.,* 823 F.2d 1073, 1084 (7th Cir.1987), *cert. dismissed,* 485 U.S. 901, 108 S.Ct. 1101, 99 L.Ed.2d 229 (1988) (when reasons for denying motion for sanctions are apparent, judge need not "belabor the obvious"; but when motion is "serious," parties are entitled to explanation of findings).

JUDGMENT VACATED AS TO AWARD OF GOOD WILL DAMAGES AND DENIAL OF SANCTIONS.

JUDGMENT AFFIRMED IN ALL OTHER RESPECTS.

CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY APPELLANTS MARI–ANE FOWLER AND HOLLADAY–TYLER PRINTING CORPORATION.