475 A.2d 1203

**TABS ASSOCIATES, INC.**

v.

**Mary BROHAWN, et al.**

**No. 985 Sept. Term, 1983.**

Court of Special Appeals of Maryland.

June 7, 1984.

Robert R. Bowie, Jr., Towson, with whom were White, Mindel, Clarke & Hill, Towson, on the brief, for appellant.

Jeffrey P. Hanes, Baltimore, for appellees.

Argued before LISS, WEANT and BELL, JJ.

LISS, Judge.

This case involves a dispute as to what is and what is not a protectable trade secret under the law of Maryland.

Tabs Associates, Inc. (Tabs), the appellant herein, is in the business of presorting, by zip code, the mail of its customers so that they may receive reduced rates for mailing from the U.S. Post Office. There is nothing secret or protectable about sorting mail by zip code; the Post Office performs this procedure daily.

Tabs contends that it developed a two-pronged method which permitted it to become a profitable mail presorting business and that this method amounts to a trade secret. Historically, trade secrets have been protectable under Maryland law. In 1977, when Tabs began its operation in Baltimore, it attempted to use a mail sorting process similar to that used by the Post Office and incurred an operating loss of $15,000 in its first five months of operation.

During the next several years, Tabs developed a profitable market selection process, targeting certain types of banks and local governments as customers. Tabs also formulated an efficient system for the physical sorting of mail, known as the "kill-sort" method, which it argues is unique in the industry. Utilizing its combined system of marketing and kill-sorting, Tabs became one of the few profitable presort mail businesses in the country. Unrebutted testimony corroborated Tabs' assertion that this system is the source of Tabs' success, that no Tabs competitor had developed a similar process, and that many of Tabs' competitors had failed over the same period of time because of their failure to develop a similar viable process.

During 1979 and 1980, Tabs expanded its operations to fifteen cities, using the system developed in Baltimore at each new location. In 1980, Tabs developed a Standard Operating Procedures Manual in which it committed to writing its entire system of profitable operation, from marketing through the deposit of mail.

On May 9, 1983, Tabs filed a petition in the Circuit Court for Anne Arundel County, in equity, seeking injunctive relief and damages, listing as respondents, Mary Brohawn, George Brohawn and PSM. The petition sought to prevent both the operation of PSM and its contact with Tabs' customers. It alleged that Mr. and Mrs. Brohawn left Tabs and set up an identical business, PSM, with the same sorting system and identical customers, including one of Tabs' actual customers, in violation of their fiduciary duties to their prior employer and Mary Brohawn's employment contract and trade secrets agreement. In short, Tabs alleged that the appellees had appropriated the distinguishing process which Tabs alone had developed profitably and used the process for their own benefit.

On May 9, 1983, an *ex parte* order enjoining all three appellees from operating PSM was signed. On May 17, 1983, following a closed hearing, another judge in the Circuit Court for Anne Arundel County signed an interlocutory injunction order with respect to Mary Brohawn, only, enjoining her from further contact or communication with PSM and ordered that testimony and exhibits presented at the hearing were to be sealed, subject to further order of the court.

On May 27 and 29, 1983, a final hearing was held before still another circuit court judge. At the close of Tabs' case, appellees' motion to dismiss was granted. Tabs' subsequent motion for reconsideration was denied and Tabs filed this appeal in which the following questions are raised:

    1.  Did the trial court err in ruling that appellants had failed to establish a *prima facie* case based on violation of a legally enforceable covenant not to compete?

    2.  Did the trial court err in ruling that appellants had failed to establish a *prima facie* case based on violation of a legally enforceable trade secrets agreement?

    3.  Did the trial court err by relying on evidence not on the record in granting appellees' motion to dismiss?

During testimony, Frederick Ford, Tabs' president, summarized the uniqueness of the Tabs process as follows:

... Basically it is a pre-designed, pre-packaged analyzed product for certain customers. That definition and the methods in which we define that mail, first by having the marketing personnel introduce themselves to the actual customer mail operation; second, by obtaining all information concerning mail density, zip codes from the customer; third, the operations training that goes into the management and the specific design of the kill-sort bins, thereby designing a product or service for a certain type of pre-sorting customer. And the final, the movement of work flow at such a method that [is] most profitable.

Once its process was developed, Tabs took steps to protect it. Each management employee was required to sign an acknowledgement of receipt of the Standard Operating Procedures Manual, to sign a trade secret agreement and to sign an employment contract which contained a covenant not to compete. During the mail sorting process, Tabs required that a management employee be on site at all times. Tabs' work facilities were entirely enclosed so that competitors and the general public were prevented from observing the Tabs mail sorting process.

Frederick Ford estimated that from Tabs' beginning in 1977, until May, 1983, one hundred eighty thousand dollars in top management's time was invested in the analysis of mail production, bin changes, and functions related to opening Tabs' various facilities, and that an additional fifty-five or sixty thousand dollars was spent on equipment, mainly sorting bins.

During the course of Tabs' development, Frederick Ford visited the shops of at least twenty of Tabs' competitors, although competitors were denied access to Tabs' facilities. Ford found few companies operating profitably and none using Tabs' process of customer analysis. The competitors' systems of sorting mail were similar to that used by the Post Office.

Appellee Mary Brohawn was hired by Tabs in 1980 as a mail clerk. Subsequently she became an assistant supervisor and signed an employment contract which contained a recitation of the proprietary and confidential nature of the Tabs business and a covenant not to compete for three years with no geographic limitation, as well as an acknowledgement of Tabs' "trade secret security program." Mary Brohawn had access to Tabs' entire facilities in Baltimore and Beltsville, Maryland. She ran the shop in the evenings, scheduled employees, communicated with customers and monitored production and mail flow. On July 7, 1982, Mary Brohawn was demoted and she immediately resigned her employment with Tabs.

Mary Brohawn's husband, George Brohawn, was also an employee of Tabs, working with his wife first as a mail clerk, then as a driver, and later as a group leader for the evening shift. As group leader, Mr. Brohawn monitored the work flow, assigned mail to clerks and substituted for Mrs. Brohawn in performing various other tasks. George Brohawn left Tabs' employment the same day his wife resigned, in July, 1982. There is no evidence that Mr. Brohawn signed either an employment contract or a trade secrets agreement.

Earlier in his career, Mr. Brohawn had been employed with the United States Post Office, where he had seen the presorted mail come into the Post Office, and learned about presort mail requirements.

In the fall of 1982, PSM Associates (PSM), a competing mail presort business, was begun by George and Mary Brohawn. Their customers were all banks and local governments [1] with high density zip code mailings, which were the identical target business for the Tabs service.

---

**1.** When his deposition was taken in May of 1983, George Brohawn stated that PSM's customers were First Federal, Anne Arundel County Government, North Anne Arundel Federal Savings and Loan, Odenton Federal Savings and Loan, American National Bank, and Maryland National Bank, the latter having been identified as also being a customer of Tabs.

Furthermore, PSM had contacted First National Bank, a customer of Tabs, and was doing business with Maryland National Bank, one of Tabs' principal customers. Tabs first learned that the Brohawns had set up a competing business when Maryland National Bank and First National Bank of Maryland informed a Tabs vice-president that George Brohawn, representing PSM, was offering a competing presort mail service. Tabs hired the Laughlin Security Agency to observe the operations of PSM, Mary Brohawn, and George Brohawn in order to determine whether the trade secrets of Tabs were being used at PSM and whether Mary Brohawn was violating her employment contract covenant not to compete.

At trial, Carl James Hoffman, a licensed private investigator, testified that for several months in early 1983 he observed Mr. Brohawn and Mrs. Brohawn inside the PSM office directing or participating in the presorting of mail. On one occasion he went into the PSM shop and asked to see the manager. An employee of PSM, who was sorting mail, identified Mrs. Brohawn as the manager and then Mrs. Brohawn identified herself as the owner of PSM. Mr. Hoffman further testified that during his visit inside the PSM shop, he saw boxes of Maryland National Bank's mail being sorted by PSM.

When her deposition was taken in May of 1983, Mary Brohawn stated that her only "employment" since leaving Tabs was going to school to learn to sell insurance.

When his deposition was taken in May, 1983, George Brohawn testified that he was involved in a business called PSM Associates, presorting first class mail. These depositions were admitted into evidence as part of the plaintiff's case.

### 1.

Maryland law generally divides covenants not to compete between employer and employee into three categories: (1) restrictive covenants in cases of the sale of goodwill in a business; (2) restrictive covenants contained in an employ-

ment agreement to protect customer lists and customer contact; and (3) restrictive covenants contained in employment agreements that protect trade secrets.[2]

■ With respect to the covenant in the instant case, the trial judge ruled that there was no evidence of competition between Tabs and PSM, despite unrebutted testimony that a customer of Tabs, Maryland National Bank, had informed Tabs of PSM's request to sort the bank's mail, that Maryland National Bank had had mail sorted at the PSM location, and an admission on the record by George Brohawn that Maryland National Bank was one of PSM's customers. The court inferred, *sua sponte*, that there was no competition since PSM and Tabs probably were dealing with different branches of the same bank, although such an inference on the state of the record was not available to the court in its consideration of the motion for dismissal. The covenant in the agreement not to compete created a statewide obligation. A balancing test is generally used in which the need for protection of the employer is balanced against the hardship imposed on the employee in cases other than trade secret cases. *Tuttle v. Riggs-Warfield-Roloson, Inc.*, 251 Md. 45, 246 A.2d 588 (1968); *Tolman Laundry v. Walker*, 171 Md. 7, 187 A. 836 (1936). In this case the former employee's skills are primarily managerial and may be used in any other business so that no hardship would seem to be created by enforcement of the agreement.

Tabs contends, therefore, that an injunction against Mary Brohawn is proper for at least the three-year period to which she herself agreed to in her employment contract, since Tabs established that she had violated the agreement, as well as all elements which support the enforcement of such a restrictive covenant.

The appellees contend that no injunction is warranted in that no significant past nor likely future damages to Tabs

---

2. *See Restrictive Covenants in Maryland Employment Agreements: A Guide to Drafting,* 11 U.Balt.L.Rev., No. 3, 377–405 (Spring, 1982).

have resulted from the alleged competition of Mary Brohawn.

The Maryland cases dealing with restrictive covenants all refer to and attempt to determine whether the restraint is reasonably necessary for the protection of the employer's business.

This Court at this point in the proceedings is called upon to determine only whether Tabs established a *prima facie* case which was improperly dismissed by the trial court at the close of the plaintiffs' case. Maryland appellate courts have ruled that when ruling on a motion to dismiss, pursuant to Maryland Rule 535, the trial judge must consider all of the evidence and all logical and reasonable inferences deducible therefrom in the light most favorable to the plaintiff. *Washington Suburban Sanitary Commission v. TKU Associates,* 281 Md. 1, 376 A.2d 505 (1977); *Moy v. Bell,* 46 Md.App. 364, 416 A.2d 289 (1980). The trial judge must determine if such evidence and inferences set forth a *prima facie* case for the cause of action alleged. *Snider Bros., Inc. v. Heft,* 271 Md. 409, 317 A.2d 848 (1974).

The elements required for the establishment of a *prima facie* case for violation of a restrictive covenant in an employment contract which prohibits competition with a former employer are contained variously in *Gill v. Computer Equipment Corp.,* 266 Md. 170, 292 A.2d 54 (1972); *Western Maryland Dairy v. Chenowith,* 180 Md. 236, 23 A.2d 660 (1942); *Hebb v. Stump, Harvey & Cook, Inc.,* 25 Md.App. 478, 334 A.2d 563 (1975). In summary, Maryland courts have sustained such covenants on a case-by-case basis as long as the provisions were a reasonable effort to protect the business of the employer. *Ruhl v. F.A. Bartlett Tree Expert Co.,* 245 Md. 118, 125, 225 A.2d 288 (1967).

In *Becker v. Bailey,* 268 Md. 93, 96, 299 A.2d 835 (1973), the Court of Appeals said:

The general rule in Maryland is that if a restrictive covenant in an employment contract is supported by adequate consideration and is ancillary to the employment

contract, an employee's agreement not to compete with his employer upon leaving the employment will be upheld if the restraint is confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public. [Citations omitted].

■ Evidence presented by Tabs regarding the nature of its business and of Mary Brohawn's employment, with the extent of her involvement in the Tabs process,[3] and the content of the restrictive covenant she executed was sufficient to establish a *prima facie* case. The trial judge, however, determined that there was no competition between Mary Brohawn and Tabs since "[t]here's no bar to a similar business in a different location or one that's not competitive with the TABS ASSOCIATES operation." He concluded that there was no "overlapping clientele except for Maryland National" at a different location, and no violation of the covenant because there was no "trade secret in the first place" nor any "testimony [that] she used the list of clients or used the pricing information after she left Tabs."

In *Becker v. Bailey, supra*, at 97, 299 A.2d 835, it was noted that "... a comparative examination of the cases in this State ... demonstrate[s] that Maryland follows the general rule that restrictive covenants may be applied and enforced only against those employees who provide unique services, or *to prevent the future misuse of trade secrets, routes or lists of clients, or solicitation of customers.*" [Citations and footnote omitted]. [Emphasis supplied].

In the instant case, there was evidence that, despite the trial judge's reference to Mary Brohawn's having "a possi-

---

3. Although there is no evidence that Mary Brohawn was directly involved in sales or marketing for Tabs, her duties included contact with Tabs' customers regarding scheduling and direct work with their mail, whereby she could ascertain easily the names and addresses of Tabs' customers. She had, in addition, unlimited access to the Tabs facilities and its operations manual.

ble chance of seeing lists of clients," Mary Brohawn had access to and contact with the names of Tabs' clients throughout her employment by Tabs. In addition, there was testimony that George Brohawn, representing PSM, had actually contacted at least one of Tabs' customers. The trial court's dismissal of Tabs' claim that Mary Brohawn had violated the covenant not to compete, based on its conclusion that Tabs failed to present a *prima facie* case, was, therefore, clearly erroneous.

The appellees' argument that, rather than legitimate protection, the purpose of the restriction against Mary Brohawn for three years with no geographic limitation was purely anticompetitive, is unconvincing. The covenant attempts to restrict communication with potential clients or present customers.

In *Hebb v. Stump, Harvey & Cook, Inc., supra,* where a similar contention was raised against enforcement of a covenant not to compete with no geographic limitation, this Court found that the lack of a specified geographic area was not crucial, where the covenant provided a reasonable protection of the employer's right without unduly burdening the employee. In *Hebb* we did not intend to foreclose all competition, but rather to foreclose competition from former employees who seek to profit from the developmental efforts expended by the employers with whom they then compete. In *Silver v. Goldberger,* 231 Md. 1, 6–8, 188 A.2d 155 (1963), the Court of Appeals said:

> While a person may not be restrained from engaging in any business or vocation (useful to the community) which he is qualified to conduct or perform, the general rule is that restrictive covenants in a contract of employment, by which an employee as a part of his agreement undertakes not to engage in a competing business or vocation with that of his employer on leaving the employment, will be sustained if the restraint is confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee

or disregard the interests of the public. [Citations omitted].

\*     \*     \*     \*     \*     \*

*Contracts (containing restrictive covenants) of agents,* salesmen, deliverymen *and other employees, who,* in operating a regular route, *or in serving the same customers constantly, come into personal contact with the customers of the employer, usually come within the class or type of cases in which justification does exist. Such contracts have been held by this Court to be valid and enforceable* in cases of a bakery route operator, *Deuerling v. City Bakery Co., supra,* a laundry route operator, *Tolman Laundry v. Walker, supra,* and milk and dairy products employees, *Western Maryland Dairy v. Chenowith,* 180 Md. 236, 23 A.2d 660 (1942).

\*     \*     \*     \*     \*     \*

*. . . Had the appellant been able to show that his former employees had or were likely to take some of his clients away from him, the situation might have been [resolved in his favor].* [Emphasis supplied].

## 2.

Tabs requested that the appellees be enjoined from continued use of its trade secrets, and that Mary Brohawn be enjoined from further violation of the trade secrets agreement which was included in the employment contract she signed in November, 1981. The contract provides specifically for the protection of "confidentiality and proprietary information," and the trade secrets agreement specifies the matter comprising Tabs' secrets. Mary Brohawn also signed a release conditioned upon her recognition of the proprietary nature of Tabs' secrets.

Maryland courts have recognized the duty of a former employee not to disclose proprietary information even where no duty was specifically imposed by contract, under a common law fiduciary duty. In *Space Aero Products Co.*

*v. R.E. Darling Co.,* 238 Md. 93, 208 A.2d 74 (1965), the Court of Appeals said:

The processes used by Space Aero were the same as those used by Darling.

$$* \quad * \quad * \quad * \quad * \quad *$$

While none of the former employees had signed a contract with Darling in which they formally agreed not to use the information acquired by them, and while they were free to leave their employment at will, [the trial court] found that they owed the duty of fidelity to their employer while they were employed. We agree. [Citations omitted]. That [cases cited] involved the improper solicitation by employees of their employer's customers, rather than the improper use of the employer's trade secret, does not make the principle for which those cases stand less applicable. It is the breach of the confidential relationship rather than the form which that breach takes which is determinative. [*Id.,* at 115, 208 A.2d 74.]

The Court then stated:

We agree with the court below that the former employees violated the duty of fidelity and trust that they owed to Darling in respect of the trade secret and that their conduct was such as to entitle Darling to the protection of a court of equity. [*Id.,* at 117, 208 A.2d 74.]

Based on testimony presented in the trial court by Tabs' private investigators, Mary Brohawn similarly violated her contractual and fiduciary duty to Tabs in that she was engaging in a business (PSM) in direct competition with Tabs. By her own admission she is a part-owner of PSM, wherein Tabs established, at least *prima facie,* that its trade secrets are being utilized. The deposition of Mary Brohawn indicates that she had no experience with presort mail at all prior to working for Tabs.

Other evidence introduced at trial indicates that neither George Brohawn nor Mary Brohawn had, prior to working for Tabs, been in the business of presorting mail for profit. The testimony of George Brohawn in his deposition indi-

cates only that he worked for the Post Office prior to 1977, but, although familiar with the Post Office rules and regulations for bundling and delivery of presorted mail to the Post Office, he had no knowledge of Tabs' *process* for presorting mail for profit.

The record reveals that PSM's operation utilizes each feature of Tabs' two-pronged process. PSM is currently servicing one of Tabs' customers. It was inferable therefore, that Mary Brohawn used information and knowledge acquired during her employment by Tabs in establishing PSM.

In accordance with the fiduciary duties discussed above and in the light of Mary Brohawn's specific agreements, both Mary and George Brohawn may be enjoined from use of Tabs' trade secrets. Furthermore, Maryland courts have enjoined the use of another's trade secrets for the benefit of a third-party business which profits from the acquisition of the trade secrets of another. It is well established in Maryland that restrictive covenants may be utilized to prevent the "future misuse of trade secrets" by employees. *E.L. Conwell & Co. v. Gutberlet*, 298 F.Supp. 623, *aff'd*, 429 F.2d 527 (4th Cir.1970); *Silver v. Goldberger, supra; Tawney v. Mutual System of Md.*, 186 Md. 508, 47 A.2d 372 (1946).

In *Head Ski Company, Inc. v. Kam Ski Company, Inc.*, 158 F.Supp. 919 (D.Md.1958), the federal court, applying Maryland law, enjoined a business which had begun marketing a competing product derived from the trade secret of another. The injunction prohibited the competing company from entering into any further business since their business was fashioned out of the trade secret of another.

The crucial question here is whether Tabs established a *prima facie* case that there is, in Tabs' possession, a protectable trade secret. The appellees contend that no trade secret exists in this case and that no alleged trade secret was utilized at PSM. They argue that the characterization of simple common sense business procedures as a

process does not, without more, establish a *prima facie* case warranting trade secret protection. The trial judge concluded that the facts did not establish the existence of a protectable trade secret since Tabs' "process" consisted of simple, ordinary, routine procedures; "plain old common sense ... and things that are so obvious that [they] can't be protected by any trade secret theory." The trial judge stated in his oral opinion:

> [Frederick Ford's] main thrust is that he trys to apply the actual distribution of a client's mail to the way he sets up the bins, which is also pretty logical. If a certain client distributes most of his mail to ten or twelve zip codes then you put those ten or twelve right in front. But that doesn't require any protection by a trade secret, anybody can figure that out. So that most of what he's testified to is what he's learned from experience. And I suppose you could probably say the same thing about a plumber or an electrician that puts his most often used tools in the front of his tool box and the lesser used tools in the back of the tool box.

The trial judge concluded:

> Maybe that's some kind of a trade secret so he can get it done faster, but it doesn't apply here, and I don't think you can protect that sort of thing by trade secrets.

In *Space Aero Products Co. v. R.E. Darling, supra,* 238 Md. at 110, 208 A.2d 74, the Court of Appeals stated that the "factors to be considered in determining whether given information is one's trade secret" include:

> "(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be

properly acquired or duplicated by others." Restatement, Torts, § 757b.

A review of these factors indicates that all six have been met at least *prima facie* by Tabs. To the extent to which the information is known outside of the Tabs business, the record does not reveal that any competitor had prior knowledge of Tabs' "process" for choosing particular categories of clients, analyzing customers' mail to determine profitability, or had any knowledge of Tabs' sorting technique. As to the extent to which the information is known by employees and others involved in his business, the testimony reveals that Tabs' analysis of the customers' business was performed by supervisors and outlined in the operations manual which was marked "trade secret" and locked in the supervisor's desk drawer. The mail sorters were not given access to the operations manual. As to the extent of measures taken by it to guard the secrecy of the information, the record indicates that Tabs, to protect its trade secret, placed guards at the entrance and exit of the mail sorting buildings, and all of its mail sorting was done in buildings without windows. Supervisors were required to sign trade secret agreements and restrictive covenant employment agreements. The operations manual was stamped "trade secret" and many of the operations discussed in the manual were designated to be treated in a particular manner in order to not divulge the trade secret to the general public or to Tabs' competitors. The value of the information to Tabs and to its competitors reflect that Tabs' trade secret is the essence of its business. The "process" which it has developed is the sole reason for Tabs' profitability. In an industry where many of Tabs' competitors have gone out of business, the "process" is alleged to be the difference between failure and success. As to the amount of effort or money expended by Tabs in developing the information, the record indicates that Tabs' process was developed and perfected over a considerable period of time by Tabs' founders and high level employees, and substantial sums of money were expended on research and development. The ease or

difficulty with which the information could be properly acquired or duplicated by others was evidenced by the failure of many of Tabs' competitors to duplicate the two-pronged process developed by Tabs. This process could have been duplicated only with properly acquired information by the expenditure of considerable time, effort and money on research and experimentation. Once perfected by Tabs, the process could be duplicated easily by one who improperly acquired and used the information and system which Tabs had perfected.

■ Maryland law has recognized that a trade secret can be a "process" or a certain "know how" which a business attempts to keep "secret" for its business benefit. Trade secret was defined in *Operations Research, Inc. v. Davidson & Talbird, Inc.*, 241 Md. 550, 558, 217 A.2d 375 (1965), as "... a process or device for continuous use in the operation of the business. [T]he subject nature of a trade secret must be secret." [Citation omitted]. The "process" itself can be a collection of steps which are publicly known but which can in conjunction amount to the trade secret. In *Head Ski Company, Inc. v. Kam Ski Company, Inc.*, *supra*, at 923, the Court made this clear:

> Defendants contend that plaintiff's processes, methods and materials cannot be trade secrets, since they are known to and used by aircraft mechanics and engineers. This overlooks *the fact that a knowledge of the particular process, method or material which is most appropriate to achieve the desired result may itself be a trade secret. So may a knowledge of the best combination of processes, methods, tools and materials. The mere fact that the means by which a discovery is made are obvious, that experimentation which leads from known factors to an ascertainable but presently unknown result may be simple, we think cannot destroy the value of the discovery to one who makes it,* or advantage the competitor who by unfair means, or as the beneficiary of a broken faith, obtains the desired knowledge without himself paying the price in labor, money, or machines

expended by the discoverer. [Citation omitted]. [Emphasis supplied].

■ In addition, the *organization* of simple manual operations or devises can constitute a trade secret. In *Space Aero Products Co. v. R.E. Darling Co., supra*, 238 Md. at 106–07, 208 A.2d 74, the Court observed:

[S]ome of these steps consist of simple manual operations and the use of devices and uncomplicated machinery which in themselves were known to the industry. It is not any one of the steps but their selections, order and conjunction which Darling contends is its trade secret.

\* \* \* \* \* \*

This "know how" can be achieved by a "process" of error before the requisite "know how" was achieved.

The Court continued:

The testimony as to whether Darling's methods and processes were unique, and, as a composite result, known only to it, or whether they were generally known and in the public domain, is voluminous and conflicting. The record, as a whole, convinces us that the trial judge was not in error in his implicit finding that Darling's "know-how" in the manufacture of its hoses was the subject matter of a trade secret. [*Id.*, at 109, 208 A.2d 74].

■ It is not essential to a trade secret designation that there be absolute secrecy, "but a substantial element of secrecy must exist so that there would be difficulty in others properly acquiring the information." [*Id.*, at 109–110, 208 A.2d 74]. [Citations omitted].

■ Tabs' "process" is unknown to and has been kept secret from its competitors; and this "process" is the source of Tabs' profitability. The appellees are using the identical "process," have the same type of clients, have contacted Tabs' customers, and are currently doing business with at least one of these customers. Tabs attempted to protect its trade secret by marking the operations manual "secret" and keeping it in a locked drawer of the manag-

er and assistant manager's office. Furthermore, as a condition precedent to employment of managers and assistant managers it required an agreement to keep the process for presort profitability secret, and Tabs also required that these employees sign a trade secret agreement. In addition, certain security precautions were taken with respect to the work site including a sign in process, and a jobsite security process.

Since the record reflects that Tabs satisfied each element required to establish a *prima facie* case for violation of its trade secrets, the trial court's granting of the appellees' motion for dismissal was erroneous.

We conclude that the appellees were required to go forward in response to the *prima facie* case established by the appellants.

3.

When the trial judge concluded that Tabs had no protectable trade secret he addressed only Tabs' claims to a trade secret in its method of mail sorting. In response to an inquiry by counsel as to why the process for customer selection was not addressed in the court's opinion, the judge stated:

> Well, the process is widely used. If you want to get into that. It's actually taught by the Post Office, the whole thing was started by the Post Office, bigger companies have been doing this on their own without the use of companies like TABS for sometime. Montgomery Ward pre-sorts all its mail on its own. Maybe not Montgomery Ward, but some big companies do.

There is, however, no evidence in the record to the effect that Tabs' process is widely used; that it is actually taught by the Post Office; that the whole process was actually started by the Post Office; or that bigger companies have been doing this on their own without the use of companies like Tabs for some time period.

In concluding that Tabs had not established a *prima facie* case for violation of the covenant not to compete, the trial judge stated:

> There's no testimony except for Maryland National Bank that there's any competition with the operation of TABS ASSOCIATES. TABS ASSOCIATES indicated in its testimony thru Mr. Ford that they go into a market, into a big city and deal with high volume mailers. They're in Baltimore dealing with high volume bank mail, which from the testimony, I gathered to be from the Maryland National Bank in Baltimore. Maryland National has offices all over the State of Maryland, but it wouldn't make any sense for them to send mail in from their branches to a central place in Baltimore to mail, I wouldn't think. But there's no testimony with regard to that anyway. So whether or not there's competition by an operation in Anne Arundel County is not clear from the testimony, and certainly not made clear enough to withstand a Motion to Dismiss. There's no bar to a similar business in a different location or one that's not competitive with the TABS ASSOCIATES operation. And by all the testimony this operation is in Anne Arundel County on Mountain Road and not in Baltimore City. It doesn't have any of the overlapping clientele except for Maryland National. And I don't think that the employment contract would prohibit this kind of thing because it's not a trade secret in the first place. And there's no testimony that she had anything other than a possible chance of seeing lists of clients. There's no testimony she used the list of clients, or used the pricing information after she left TABS.
>
> So I think the plaintiff has failed in all respects to show any cause of action against any of the three defendants. So I will grant the Motion to Dismiss as to all three.

The trial judge's conclusions were not based on the record. Since the standard for granting a motion to dismiss requires that the court consider all material facts as well as all reasonable inferences deducible therefrom, in the light most favorable to the party opposing the motion, and

against the party making the motion, the court's conclusions were without factual basis in the record, arbitrary and clearly erroneous.

ORDER VACATED; REMANDED FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY APPELLEES.