ANCORA CAPITAL & MANAGEMENT
GROUP, LLC d/b/a JETSORT

v.

CORPORATE MAILING
SERVICES, INC.

and

Philip E. Gray

No. CIV. CCB–01–2804.

United States District Court,
D. Maryland.

July 25, 2002.

Lawrence Joseph Quinn, Tydings and Rosenberg LLP, Baltimore, MD, Kenneth W. Irvin, Morrison and Foerster LLP, Washington, DC, Jeffrey D. Bukowski, G. Thompson Bell, III, Stevens and Lee, Reading, PA, for Plaintiff.

Andrew Jay Graham, Laura M.L. Maroldy, Kramon and Graham, Jeffrey Allan Wothers, Niles Barton and Wilmer LLP, Baltimore, MD, for Defendants.

### MEMORANDUM

BLAKE, District Judge.

Now pending before this court is a motion for summary judgment brought by defendants Corporate Mailing Services, Inc. ("CMS") and Philip E. Gray. Plaintiff Ancora Capital & Management Group, LLC d/b/a Jetsort ("Jetsort") brought this suit in response to events surrounding the defection of one of its employees, Gray, to a competitor, CMS. Jetsort alleges that

because Gray was bound by various restrictive covenants limiting competition for a period of two years following his employment, he is in breach of that agreement by virtue of his employment with CMS. Jetsort also alleges that Gray and CMS conspired to wrongfully convey to CMS Jetsort's protected trade secrets. This matter has been fully briefed and no further hearing is necessary.[1] *See* Local Rule 105.6. For the reasons set forth below, defendants' motion will be granted in part and denied in part.

### Background

Jetsort and CMS are both in the mail pre-sort business. As described by Jetsort in its opposition,

> [a] mail pre-sorter serves customers that routinely send large volumes of first-class mail, such as banks or insurance companies. The mail pre-sorter processes mail for businesses in advance of delivering it to the U.S. Postal Service to enable them to obtain discounts on postage. For example, for first-class mail, the U.S. Postal Service provides discounts from its standard rates for mail of at least 150 pieces if it is pre-sorted to the first 3 digits of the normal five to nine digit U.S. zip code. The discounts are even greater if the mail is pre-sorted to five digits. As these discounts can be as great as 25% of the cost of normal first-class postage, customers are willing to pay for pre-sorting services in order to obtain the discounts.

(Norman Decl. ¶ 2.) According to Jetsort, it uses sophisticated hardware and software systems in its sorting business. (*Id.* at ¶ 3.) Because its customers do not always send out sufficient quantities of mail each day to obtain maximum discounts,

Jetsort combines mail from different customers to maximize discounts with the United States Postal Service ("U.S.P.S."). (*Id.* at ¶¶ 2–3.) In this way it provides each customer with the ability to obtain greater discounts than would be possible on the customer's own behalf. (*Id.* at ¶ 3.) Jetsort claims that it has developed a proprietary scheme that allows it to sort and commingle the mail in a manner that maximizes customer discounts. (*Id.*) This scheme also allows it to predict how many envelopes will have readable zip-codes. (*Id.*) Armed with its ability to predict its customers' mailing patterns, Jetsort "combines this knowledge in a proprietary manner that allows it to offer its customers a fixed-fee, guaranteed rate of postage for their mailing as opposed to the industry standard of charging a processing fee, plus an additional postage assessed by the U.S.P.S. on a customer's mail ...." (*Id.* at ¶ 5.) The "industry standard" pricing scheme is referred to as "flow through" pricing. Jetsort claims to have been the only company in the mid-Atlantic region to offer a fixed pricing structure until defendant CMS began offering the same. (*Id.* at ¶ 4.) According to Jetsort, "[a]ll other mail pre-sorters used flow-through charges for any additional postage assessed a given customer's mail. Jetsort's unique process allows it a competitive advantage over all other mail presorters, except now CMS has wrongfully begun using Jetsort's knowledge." (*Id.*)

Defendant Gray was employed in a management capacity at Jetsort beginning in 1992. (*Id.* at ¶ 5.) In April of 1999, Gray was promoted to be the Vice–President of Operations at Jetsort. (*Id.* at ¶ 6.) In connection with the promotion, Gray's salary was increased to $100,000, he was asked to

---

1. These issues were discussed at the hearing on Jetsort's motion for preliminary injunc- tion, which was denied.

execute an employment agreement (the "Employment Agreement"), and he was paid $5,000 as a signing bonus. (*Id.* at ¶ 7; Pl.'s Opp., Ex. 1.) The Employment Agreement included covenants not to compete in "restricted territories," or to solicit Jetsort employees, consultants or independent contractors, for a period of two years following the termination of Gray's employment with Jetsort. (Pl.'s Opp., Ex. 1 at 3–4.) In addition, Gray executed a non-disclosure agreement that was attached to the Employment Agreement. (*Id.* at Ex. A.) The Employment Agreement acknowledged that Gray's employment was at-will, and that he could quit or be fired at any time. (*Id.* at 2.) Furthermore, the agreement provided that it could not be "amended or modified" except through a written instrument executed by both parties. (*Id.* at 4.) Finally, three months of severance benefits were to be paid if the agreement were terminated by the company "without cause." (*Id.* at 2–3.)

In early 2001, Jetsort decided to significantly restructure its business operations. (Norman Decl. ¶ 10.) As part of the restructuring, the position of Vice President of Operations was eliminated. (*Id.*) Jetsort determined that Gray would be employed as the plant manager of its Baltimore facility, and that he would receive a lower salary of $85,000 that would be in line with other plant managers in the organization. (*Id.* at ¶ 14.) Gray was informed of this change in an April 2001 meeting with Mark Mazurkiewicz, a Division President of Jetsort, and Carolyn O'Hare, Jetsort's Human Resources Manager. (*Id.*) According to Jetsort, while job performance issues were also discussed with Gray during that meeting, the sole reason for the title and salary change was Jetsort's internal restructuring. (Pl.'s Opp. at 10; Norman Decl. ¶ 12.)

According to Jetsort, at the April meeting, Mr. Mazurkiewicz informed Gray of the elimination of his position and "offered" him the lower-paid position of plant manager. (Norman Decl. ¶ 14.) Apparently Gray did not immediately accept Jetsort's offer. Concerned that he could not adjust immediately to the reduced salary, Gray suggested that the new salary be phased in over a period of three months. (*Id.* at ¶ 16.) In its opposition, Jetsort characterizes Gray's suggestion as a counteroffer, which it accepted. (Pl.'s Opp. at 12; Norman Decl. ¶ 16.) The exact nature of the agreement reached during the April 2001 meeting is disputed by the parties, as is discussed below. Essentially, there is disagreement over whether Jetsort's acceptance of Gray's counteroffer constituted a modification of the original Employment Agreement, thus possibly saving the restrictive covenants contained therein, or whether it constituted a completely new contract that did not contain any covenants restricting competition.

It is apparent that, soon after his demotion, Gray began considering other employment opportunities in the mail-presort business. On April 23, 2001, Gray sought the advice of a Pennsylvania attorney on the validity and enforceability of the original restrictive covenants. (*See* Pl.'s Opp., Ex. 10.) On July 6, 2001 that attorney, Leonard Tintner, issued a written opinion to Gray that the original Employment Agreement had been "superceded" by a new agreement that was effective on April 16, 2001, when he agreed to serve as the plant manager. (*Id.*)

Also in April 2001, Gray began meeting with Stephen M. Linsenmeyer, the President of CMS. Mr. Linsenmeyer testified in deposition that, prior to his ultimate hiring of Gray, he did not require any background information other than that Gray had been a plant manager at Jetsort.

(Pl.'s Opp., Ex. 17 at 79.) During these discussions, Gray also informed Mr. Linsenmeyer of his personal contacts with Jetsort's customers. (*Id.* at 142, 144.) Mr. Linsenmeyer eventually created a new position at CMS so that Gray could come in and "run the place." (*Id.* at 76.) On July 30, 2001 CMS and Gray entered into an employment agreement between themselves. (*Id.*, Ex. 2.) The agreement recited that Gray, at the time of his resignation from Jetsort, had made "oral contractual commitments" to Jetsort, which "had no restrictions in any way on [Gray's] right to leave the employment of [Jetsort]...." (*Id.* at 2.) In addition, the agreement contained a bonus provision through which Gray would receive regular payments based on the gross revenues of CMS. (*Id.* at 3.) On the day prior to his signing the CMS contract, Gray emailed Mr. Mazurkiewicz to inform him that he was resigning from Jetsort. (Norman Decl. ¶ 20.) In his deposition testimony, Gray stated that he did not inform Mr. Mazurkiewicz that he was planning to work for CMS, but instead said that he was considering "a few" different offers. (Pl.'s Opp., Ex. 16 at 104.) Gray also allegedly lied when he was directly asked whether he was planning to work for a competitor. (*Id.*, Ex. 19 at 115–16.) Jetsort claims that because it was unaware of Gray's plans, it allowed him to continue working for the two-week notice period, thereby permitting continued access to confidential company information. According to Jetsort, "[b]y concealing his true plans, Gray induced Jetsort not to take action to protect itself." (Pl.'s Opp. at 17.) Jetsort alleges that after serving out his two-week notice period and beginning his employment at CMS, Gray wrongfully disclosed Jetsort's proprietary trade secrets to CMS, and began wrongfully soliciting Jetsort's employees and clients. (Pl.'s Opp. at 18–20.)

On September 20, 2001 Jetsort filed a seven-count complaint in this court, alleging the breach by Gray of the Employment Agreement, breach of the non-disclosure agreement, the violation by Gray of Maryland's Uniform Trade Secrets Act, tortious interference with contractual relations by Gray with its customers and consultants, civil conspiracy between Gray and CMS, the violation by CMS of Maryland's Uniform Trade Secrets Act, and tortious interference with contractual relations by CMS. In January 2002, Jetsort filed motions for a temporary restraining order and a preliminary injunction against Gray and CMS. On January 11, 2002, the court denied the motion to issue a temporary restraining order, and on February 15, 2002, the court denied the motion to issue a preliminary injunction.[2]

On January 16, 2002, defendants jointly moved for summary judgment on all counts. Summary judgment will be granted on all counts except for Count I (breach of the Employment Agreement by Gray), Count V (civil conspiracy by Gray and CMS), and Count VII (tortious interference with contractual relations by CMS).

### Analysis

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together

---

**2.** The court denied the motion to issue a preliminary injunction after applying the standard set forth in *Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 811–14 (4th Cir.1991), finding that the balance of harm did not tilt in Jetsort's favor, and that Jetsort did not make a strong or substantial showing that it would likely succeed on the merits of the case.

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

"The non-moving party 'may not rest upon mere allegation or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial.'" *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir.1995)(*quoting Anderson*, 477 U.S. at 256, 106 S.Ct. 2505). The court must "view the facts and draw reasonable inferences in a light most favorable to the nonmoving party," *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994), but it also must abide by its affirmative obligation to ensure that factually unsupported claims and defenses do not proceed to trial. *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

## I. The Jetsort Employment Contract

■ In their motion, defendants argue that the Employment Agreement, including the covenants contained therein, are unenforceable because Jetsort committed a material breach by "unilaterally demot[ing]" Gray. (Defs.' Mot. at 11–12.) Defendants' theory is that because Jetsort eliminated Gray's position and cut his pay, it thereby breached the Employment Agreement. Implicit in defendants' argument is that after the demotion, Gray continued on in the position of plant manager pursuant to a wholly new, oral contract that did not contain the non-competition provisions.

■ In response, Jetsort first argues that, by virtue of the fact that Gray was an employee at will during the entire course of his employment, it is impossible for it to have breached the Employment Agreement. (Pl.'s Opp. at 23–24.) As Jetsort correctly points out, "[t]he common law rule, applicable in Maryland, is that an employment contract of indefinite duration, i.e., at will, can be legally terminated at the pleasure of either party at any time." *De Bleecker v. Montgomery Cnty.*, 292 Md. 498, 438 A.2d 1348, 1352–53 (1982). In this case, the Employment Agreement specifically indicated that Gray's employment was at-will. (Pl.'s Opp. Ex. 1 at 2.) Jetsort further argues that the negotiations and conversations surrounding Gray's demotion to the plant manager position constituted a modification of the Employment Agreement, rather than a breach or cancellation of it, and that the non-competition covenant remained in effect. (Pl.'s Opp. at 25–27.) According to Mr. Mazurkiewicz's deposition testimony, it was his understanding that when Gray agreed to stay on as plant manager at salary of $85,000, nothing except Gray's title and salary changed. (Pl.'s Opp., Ex. 18 at 82–84.) Furthermore, Gray himself testified in deposition that he did not believe he was forming a "new" contractual relationship at the time he agreed to become a plant manager. (*Id.*, Ex. 16 at 121.) On the other hand, Mazurkiewicz acknowledged that the negotiation with Gray did not include any discussion of the non-compete agreement. (Defs.' Mot., Ex.

1 at 105–6). No new written contract was signed.

In their reply, the defendants suggest that Jetsort also breached the Employment Agreement by failing to pay the severance benefits called for in the Agreement. (Defs.' Reply at 3.) Nowhere in the record, however, is it suggested that Gray made a demand for any severance payments. This could be interpreted to suggest that Gray did not believe he was entitled to severance because the Employment Agreement had been modified, rather than terminated. According to the agreement's terms, severance was payable only if the Employment Agreement was "terminated by [Jetsort] without cause." (Pl.'s Opp. Ex. 1 at 2.)

Considering all of the above, there is a genuine dispute of material fact about the existence and terms of any oral or written contract of employment that was in effect at the time Gray resigned from Jetsort.[3] Summary judgment will thus be denied on Count I.

 Summary judgment is also inappropriate for the tortious interference with contract claim against CMS (Count VII). The tort of wrongful interference with contractual relations has five elements: (1) existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff. *See Macklin v. Robert Logan Assoc.,* 334 Md. 287, 639 A.2d 112, 117 (1994); *K & K Mgmt. v. Lee,* 316 Md. 137, 557 A.2d 965, 973–74 (1989); *Vane v. Nocella,* 303 Md. 362, 494 A.2d 181, 192 n. 6

(1985); *Fowler v. Printers II, Inc.,* 89 Md. App. 448, 598 A.2d 794, 802 (1991).

 In order to prove the third element of the tort, plaintiff must show that defendant "intentionally and improperly interfere[d] with the performance of a contract." *K & K Mgmt.,* 557 A.2d at 974. According to CMS, because it believed, by way of reliance on the opinion of Gray's counsel, that the Employment Agreement was unenforceable, the third element of the tort cannot be established. The law, however, runs contrary to CMS' argument. A defendant's wrongful belief that a contract is invalid or unenforceable is not a defense to a tortious interference claim. *See Daugherty v. Kessler,* 264 Md. 281, 286 A.2d 95, 98–99 (1972); *Fowler,* 598 A.2d at 803 n. 6. Rather, under Maryland law, if the defendant has knowledge that a person is bound by a covenant not to compete, the employment of that person may itself constitute intentional interference with the covenant. *See Fowler,* 598 A.2d at 803–04. The defendant need not have actively induced an employee at will to quit to be liable, so long as the defendant subsequently employs the bound person after she has resigned. *Id.* According to the Court of Special Appeals:

> [n]or must a new employer even have knowledge of the restrictive covenant in the employee's previous contract, when it hires her, in order to incur liability for tortious interference with that covenant. Rather, the central question is whether, upon learning of the restrictive covenant that binds its new employee, the new employer nevertheless "engages the employee to work for him in an activity that would mean violation of the contract not to compete."

---

**3.** The defendants also argue that the non-compete agreement is unenforceable because it is incomprehensible. While I agree that the clause is not well-written, under a common sense interpretation it prohibits Gray from working for a competitor of Jetsort, such as CMS. Gray understood that meaning. (Pl.'s Opp., Ex. 16 at 64.)

*Id.* at 804 (internal citation omitted). In the current case, there is no question that CMS had actual knowledge of the Employment Agreement before it hired Gray, since it admits that it considered the advice of Gray's attorney regarding the agreement itself.

■ Finally, there is evidence in the record that suggests that CMS wrongfully attempted to trade on the goodwill of Jetsort. This evidence also tends to belie CMS' claim that its employment of Gray was not improper, or its claim that its conduct was "justified or excused." (Defs.' Mot. at 21.) It is true that where a contract is terminable at will, defendant may be shielded from liability for tortious interference if it has not interfered using "wrongful means" or created a restraint of trade. *Fowler*, 598 A.2d at 803. Trading on the goodwill of the plaintiff, however, may constitute interference through "wrongful means." *Id.* at 804. In this case, plaintiff has submitted to the court a letter from CMS addressed to a potential customer that specifically mentions Gray and his former affiliation with Jetsort. (Pl.'s Opp., Ex. 15.) Furthermore, according to Mr. Linsenmeyer's deposition testimony, Gray has been involved in sales calls to Jetsort's customers. (*Id.*, Ex. 17 at 166–67.) Indeed, Mr. Linsenmeyer admitted that it was "important" for CMS' customers to know that Gray was working for CMS, and that Gray had been employed by Jetsort. (*Id.* at 173–74.)

Ultimately, CMS has failed to show that there is no dispute about its liability for tortious interference with Gray's contract with Jetsort. Therefore summary judgment on Count VII will be denied.

The same analysis requires denial of summary judgment on the civil conspiracy claim. As stated by the Court of Appeals, "[i]t is well settled that if a covenantor associates with others in a conspiracy to violate his covenant, his conduct entitles the covenantee to recover against the conspirators any damages he has sustained resulting from the breach." *Checket–Columbia Co. v. Lipman*, 201 Md. 494, 94 A.2d 433, 437 (1953). If a breach of a covenant is ultimately proved in this case, a reasonable jury applying the evidence above could infer that there was an agreement between Gray and CMS to violate that covenant, and thus a conspiracy. Therefore, summary judgment on Count V will be denied.

## II. Tortious Interference with Contractual Relations by Gray

■ Summary judgment will be granted on Jetsort's tortious interference with contractual relations claim because Jetsort has failed to proffer evidence to counter CMS' motion. As discussed *supra*, an essential element for a tortious interference with contractual relations claim is the existence of a contract between plaintiff and a third party. Jetsort, in its opposition, states that Gray interfered with its contractual relations by virtue of his contacts with Jetsort employees and his alleged recommendation that CMS hire them, and by allowing CMS to "tout" him to Jetsort's customers that CMS was attempting to win over. (Pl.'s Opp. at 44.) Yet, there was no evidence proffered that the Jetsort employees at issue were subject to employment contracts, or that any client actually breached a contract with Jetsort. Therefore, summary judgment will be granted on Count IV.

## III. Maryland Uniform Trade Secrets Act and the Non–Disclosure Agreement

■ Defendants argue in their motion that no dispute of material fact exists regarding the alleged violation of the Maryland Uniform Trade Secrets Act ("MUT-

SA") by Gray and CMS. MUTSA, by its terms, prohibits the misappropriation of "trade secrets." According to the Maryland Code

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

MD. CODE ANN., Comm. Law, § 11–1201(e)(2001). The Maryland Code defines "Misappropriation," in part, as

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) Used improper means to acquire knowledge of the trade secret; or

(ii) At the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:

1. Derived from or through a person who had utilized improper means to acquire it;

2. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

3. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . .

MD. CODE ANN., Comm. Law, § 11–1201(c).

Assuming for the purposes of argument that Jetsort has protectable trade secrets, see Tabs Assoc., Inc. v. Brohawn, 59 Md. App. 330, 475 A.2d 1203, 1205–07, 1211–13 (1984), Jetsort has proffered insufficient evidence to convince a reasonable jury that Gray or CMS has violated MUTSA.

Jetsort bases its first argument on Gray's misleading conduct at the end of his tenure at Jetsort. According to the declaration of a Jetsort vice-president, John Norman, when Gray submitted his resignation, he lied to Jetsort about his future plans. (Norman Decl. ¶ 21.) Jetsort, not knowing that Gray would soon be working for a competitor, thus continued to entrust him with confidential company information. According to Jetsort, this outcome was intended by Gray in order that he might gather confidential information and thereby increase his own value to CMS. (Pl.'s Opp. at 37.) Although Mr. Norman stated in his declaration that Gray was allowed access to confidential information during the two-week period and that Jetsort would have protected itself by cutting off such access if it were privy to his real plans, (Norman Decl. ¶ 21), he provides no evidence that Gray actually conveyed trade secrets to CMS. To permit a jury to infer misappropriation of trade secrets simply from the fact that an employee chose to work through the customary two-week notice period is not reasonable.

Further, that Gray's bonuses were based on revenue rather than profit may possibly be some evidence probative of his wrongfully trading on Jetsort's goodwill, but it does not make it more likely that he conveyed trade secrets. Similarly, neither does the fact that Gray has been involved in the marketing efforts of CMS, (Pl.'s Opp. Ex. 17 at 166–67; Ex. 13 at 4, 7, 22;

Ex. 15), necessarily suggest that any of Jetsort's "formula[s], pattern[s], compilation[s], program[s], device[s], method[s], technique[s], or process[es]" were disclosed to CMS. Both Gray and Linsenmeyer have denied that Gray provided any confidential information to CMS, (Defs.' Mot. Ex. 2, ¶¶ 10–23; Ex. 3, ¶¶ 11–24; Defs.' Reply, Ex. J ¶¶ 9–10), and indeed Gray's employment agreement with CMS specifically forbade Gray from disclosing any of Jetsort's trade secrets to CMS. (*Id.*, Ex. 3 ¶ 15.)

Jetsort's next argument also is unpersuasive. Jetsort argues, based on the declaration of John Norman that, "there is no way that CMS could have offered the fixed-fee, guaranteed postage rate pricing to [two of Jetsort's customers] without first having learned of proprietary information Gray acquired at Jetsort concerning, among other things, the characteristics of those customers' mail." (Pl.'s Opp. at 39–40.)

■ Looking at the declaration this argument is based on, however, reveals that the above argument is based almost solely on inadmissible opinion testimony. According to Fed.R.Civ.P. 56(e), affidavits submitted in support of or opposition to summary judgment must be made on the basis of personal knowledge. Looking to the Norman declaration, each point set forth in support of the theory that CMS could not have offered customers a fixed fee pricing scheme without having purloined Jetsort's trade secrets is based upon opinion and speculation (e.g., "[i]n my view, CMS could not have offered this price structure without using proprietary Jetsort information ...."; "[t]he proposal submitted by CMS to CareFirst utilizes a pricing structure and other elements based on knowledge proprietary to Jetsort and give[s] CMS an unfair advantage over Jetsort that, in my opinion, could only have

been obtained by CMS as a result of a breach by Gray of his Jetsort Employment Agreement....."). (Norman Decl. ¶¶ 25–28.) Without Mr. Norman's declaration, the trade secret claim has little evidentiary support.

Even if Norman's declaration is considered, Jetsort is still unable to sustain a MUTSA claim. According to Jetsort, CMS was only able to make competitive fixed-price bids to Jetsort clients with the benefit of information about the "characteristics" of those clients' mail. (Norman Decl. ¶ 25.) Such "characteristics" include information on how much of the mail will qualify at different U.S.P.S. discount rates ("qualification levels"). By knowing the customers' mail qualification levels, CMS allegedly could formulate a competitive fixed-price bid. (*Id.*)

Assuming without deciding that this type of information constitutes a trade secret, there is insufficient evidence in the record to conclude that Gray conveyed it to CMS. First, according to Jetsort's Mr. Norman, customers sometimes disclose their current qualification levels to competing mail pre-sorters in order to assist in the negotiation of a better deal for themselves. (Defs.' Reply, Ex. C at 157–58.) One of Jetsort's former customers, Circa Press, freely disclosed to CMS the details of its existing arrangements with Jetsort. (*Id.*, Ex. D at 21.) Second, at least in the case of the Citifinancial contract, the record indicates that CMS won this client away from Jetsort after several months of price negotiations and back-and-forth communications between Mr. Ray of Citifinancial and Mr. Linsenmeyer. (*Id.*, Ex. E at 28–31.) The record does not support a conclusion that CMS won the Citifinancial contract through the use of confidential information that was available only

through Mr. Gray.[4]

Finally, Jetsort seems to argue that the very ability to offer fixed prices in the mail pre-sort industry is a trade secret. Because Jetsort has provided virtually no detail on its alleged trade secrets beyond describing how mail pre-sorters operate generally and identifying its own processes as "state-of-the-art," (Pl.'s Opp. at 4, 33–36), the court cannot conclude that CMS, by simply offering its customers a fixed pricing scheme, must have utilized trade secrets of Jetsort. The concept of offering a fixed price for the sale of goods and services is routine in the business world. If it is true that Jetsort has developed the only way to offer such a pricing scheme, it has not presented sufficient evidence to prove that fact. Furthermore, it is established in the record that one of Jetsort's clients voluntarily disclosed to CMS that Jetsort was offering it a fixed-pricing scheme. (Defs.' Reply Ex. D at 21, 31.) Jetsort offers no proof that CMS could not have, in response, offered a fixed price on its own, without the assistance of Jetsort's proprietary material.

In conclusion, because Jetsort has proffered insufficient evidence to establish a dispute of material fact, summary judgment will be granted on the trade secrets claims (Counts III and VI). Because many of the evidentiary deficiencies set forth in this section also are relevant to Jetsort's breach of the non-disclosure agreement claim against Gray, judgment

also will be granted with respect to that claim (Count II).[5]

A Separate Order follows.

### *ORDER*

For the reasons stated in the accompanying Memorandum, it is hereby Ordered that:

1. the defendants' motion for summary judgment is **GRANTED** with respect to Counts II (breach of non-disclosure agreement by Gray); III (violation of Maryland's Uniform Trade Secrets Act by Gray); IV (tortious interference with contractual relations by Gray); and VI (violation of Maryland's Uniform Trade Secrets Act by CMS);

2. the defendants' motion for summary judgment is **DENIED** with respect to Counts I (breach of the Employment Agreement by Gray); V (civil conspiracy by Gray and CMS); and VII (tortious interference with contractual relations by CMS);

3. counsel will be contacted to set a trial date; and

4. copies of this Order and the accompanying Memorandum shall be sent to counsel of record.

---

4. In the case of another former Jetsort customer, CareFirst, Mr. Norman opines that the language in CMS' bid that states "[q]ualification of mail will meet or exceed current qualification," indicates that CMS must have wrongfully acquired data on CareFirst's qualification level. (Norman Decl. ¶ 26.) Again, noting the problems with Mr. Norman's declaration, the court disagrees that this language necessarily indicates that CMS knew

and wrongfully acquired the details of CareFirst's current qualifications.

5. The court notes that Gray allegedly did not return his laptop computer to Jetsort upon his resignation in violation of the non-disclosure agreement, and that for a period of time it was in the custody of his attorney. According to Jetsort, however, the computer should have already been returned as of the date of this opinion. (*See* Pl.'s Opp. at 38, n. 7.)